[No. 2,836.]

## JAMES LICK *v.* JOHN J. OWEN, BENJAMIN H. COTTLE AND JAMES J. OWEN.

LIBELOUS PUBLICATION.—A publication which tends to reflect shame upon a person, and to hold him up to the people as an object of ridicule, is libelous.

THE LAW IMPLIES MALICE IN A LIBEL.—If a publication is libelous, and not privileged, the law implies that it was malicious, and this presumption of law that it was malicious is one that cannot be rebutted by evidence.

PROOF TO REDUCE DAMAGES FOR LIBEL.—Although the absence of actual malice cannot be shown in an action for a libel, as a bar to the action, yet, the defendant may plead and prove the circumstances under which the publication was made, and the real motives which induced it, to reduce the amount of damages.

NEW TRIAL IN ACTION FOR LIBEL.—Perhaps, in actions *ex contractu*, when it is clear that the plaintiff is entitled to only nominal damages, the Court will not grant a new trial at his instance, but, in an action for a libel, this rule does not prevail, for the question of damages is for the jury, and the Court cannot assume, as a matter of law, that the plaintiff is entitled to only nominal damages.

APPEAL from the District Court, Third Judicial District, County of Santa Clara.

The defendants were the editors, publishers, and proprietors of the San José *Daily Mercury,* published at San José, county of Santa Clara, and, on the twenty-sixth day of April, 1870, published in the same the following article:

"MR. LICK INTERVIEWED.—Local items being somewhat scarce, yesterday, we dispatched 'one of ours' to interview our millionaire fellow-citizen, Mr. James Lick. It was rather of a delicate if not dangerous mission; but, luckily, he found the gentleman in a communicative mood, and the following conversation is supposed to have ensued:

"Reporter.—Mr. Lick, I represent the San José *Mercury,* and am in pursuit of items. As a prominent citizen of this county, and well and favorably known throughout the State, there is no doubt much in your past history that would be interesting to the public, and not improper for the public to know. May I not hope that you will give me a brief sketch of your life?

" Mr. Lick.—Certainly, my young friend, if such a recital will be of any use to you.   In the multiplicity of my business cares, the *Mercury* is the only paper I can find time to read—a splendid paper.   Editor most too radical, but, on the whole, not far from right, if he did lampoon my high board fence.   Well, I was born in Germany; I was born poor; I grew up in poverty.   After arriving at manhood, I left home and went to South America.   I first went to Brazil.   There I fell in love and got into trouble (of course my trouble did not arise from my getting in love), and in disgust left the country.    No iron horse nor stately steed was at my command.   My pedal extremities alone furnished me the means of locomotion.   After months of weary travel, all alone, through swamps and thirsty pampas, through almost interminable woods, teeming with the thousand varieties of different animal life peculiar to the tropics, and after braving innumerable dangers, I succeeded in reaching Buenos Ayres.   When I arrived there, you may depend upon it my wardrobe was not a very extensive one. I was in a worse fix than old father Adam with nothing but a coat of fig leaves.

"R.—How long did you remain in Buenos Ayres, and how did you like the country?

"L.—I lived at Buenos Ayres twenty-three years; my son, who is now with me, was born there; it is the finest country in the world, and I shall return there just as soon as I make enough to take me back.   Oh, if I had just made a fortune in California, I would have been all right; but, such is fate. I shall die as I was born—in poverty.

"R.—Why, Mr. Lick, I am surprised to hear you talk so.   Are you not as wealthy as a man could wish to be? Do you not own the magnificent Lick House, in San Francisco; seven hundred goats on Santa Catalina Island; an auk "eggery" at the Farallones; a mahogany mill at Alviso, now used as a palace for royal pigeons; and a tall board fence reaching almost to Heaven, (what is inside thereof, no man, not even a reporter knoweth,) at the southern limits of the great city of San Jose,—what more could heart desire?

"L.—It is true that I am worth a million or two of

money, more or less, but I crave to be rich. I never will be satisfied with a little, it is not in my nature.

"R.—When did you leave Buenos Ayres and come to California, and how did you manage to amass what I can but consider a princely fortune?

"L.—I came to California before the American occupancy; San Francisco, or Yerba Buena, as it was then called, was but a little Mexican hamlet. A Yankee trader lived in the village by the name of Jones; yes, Jones was his name. Well, you see, Jones used to trade whisky for fifty-vara lots to the Mexicans, he was fool enough to think that a city of great size would some day take the place of the insignificant town of Yerba Buena. One day, however, Jones (he always was kind and obliging to me) came to me and said: "Lick, you have been working for some time at your trade here and have some money, now I am a hundred dollars short on a bill I have to pay on a consignment of whisky, if you will let me have that sum I will turn over to you any amount of whisky, and if you will let me have that, of land in this place, which is bound to become a large city." I had no confidence in his predictions, and did not like to let him have the money. But as he promised to trade back any time I wished, I finally let him have it to oblige him. A few days afterward, I took a trip down the coast and when I returned, Jones was—will you believe he could have done so dishonorable a thing?—dead. Yes, he had died in less than ten days from the time he first got his digits on my hundred dollars, without ever even hinting to me that he was on the eve of doing such a thing. But you can't trust some people. I immediately saw that I been played, and that mercilessly. The next thing was to sell the various sandhills, which by force of circumstances and against my will, had become mine. But it was impossible to dispose of them; the Mexicans only laughed at me when I talked of selling them. So I was compelled to keep the lots, which were now only a mocking remembrance of the one hundred dollars I had been swindled out of. In the course of time, however, the discovery of gold was made; the great rush to California was begun, and Yerba Buena

commenced to · build up rapidly, through an influx of strangers from all parts of the world; as improvements were made there arose a demand for mechanical labor and I found plenty of work to do. Although the town was building up, I yet had no hope for my sandhills away off to one side would ever be worth anything. · Imagine my surprise when one morning a genteel looking man, who evidently had money, came to where I was employed and after asking me if I was the owner of a certain piece of property, coolly offered me fifty thousand dollars for it. I could hardly believe my ears; so inquired around, and found that I had been asleep to what had been going on for some months, as concerned real estate, and that property had advanced a thousand fold in value in a very short time. So you see, by good management and great business tact I possessed the wealth which to you seems so vast, but which to me appears insignificant in comparison with what enterprise, such as I have exhibited, should have secured.

"R.—I perceive that your business ability and spirit of enterprise are similar in every way to those characterizing the many wealthy men of San Francisco, who have become rich in the same shrewd manner. There is nothing like being able to see ahead clearly, Mr. Lick.

"L.—I have some grand designs in regard to San José. I shall make one of the most beautiful parks in the world on my tract to the south of town, but it appears that the people don't see it.

"R.—No, Mr. Lick, the fence is too high.

"L.—I intend to move all Alviso down there.

"R.—We'll make your designs for the future the subject of a separate interview, so good-bye."

The defendants, immediately thereafter, and as soon as they were informed that the article was annoying and disagreeable to Mr. Lick, and without any request from him, published the following retraction and apology:

"The Amende.—We regret very much to learn that our friend Mr. Lick took our Local's little attempt at pleasantry in last week's *Mercury* as a serious matter. Certainly no offense was intended. The statements of fact contained in

Argument for Defendants.

that imaginary interview were obtained from what we considered an authentic source, and were intended to be correct. But we learn there were several egregious errors therein. Among others that concerning Mr. Lick's nativity; he was not born in Germany, as stated, but in Pennsylvania, and his ancestors took part in the Revolutionary war; of course everybody knows that Mr. Lick is a good and worthy citizen, and it was the farthest from our purpose to cast any aspersion upon his reputation."

The plaintiff claimed one thousand dollars damages in the complaint, but did not allege special damage.

The jury, under the instruction of the Court, rendered a verdict for the defendants. The plaintiff appealed from the judgment.

The other facts are stated in the opinion.

*D. M. Delmas,* for the Appellant, argued that the malice which the law implied from the publication of a libel could not be rebutted by proof on the part of the defendant, and cited *Fry* v. *Bennett,* 5 Sandf. 54, and Townsend on Sl. and Lib. Sec. 84, *et seq.* He also argued that evidence of special damage was not necessary in order to maintain an action for libel, and cited Townsend on Sl. and Lib., Sec. 176; and that the Court should have left the question of damages to the jury, and cited *Matthews* v. *Beach,* 5 Sandf. 256.

*Ryland, Belden & Younger,* for the Defendants, argued that malice, express or implied, was necessary to maintain the action, and that, as no malice in fact was shown, and no special damages were alleged or proven, the Court would not grant a new trial, to permit the plaintiff to recover nominal damages, and cited 3 Graham & Waterman, N. T. 802; *Jenny* v. *Delidesnier,* 20 Maine, 198; *Kender* v. *Butler,* 10 Wend. 119; *Hyatt* v. *Wood,* 3 Johns. 240. They further argued that the publication was not libelous *per se,* and that, as the plaintiff rested on the pleadings, he could not recover, and cited Starkie on Slander, 168; Townsend on Slander, 189; *People* v. *Jerome,* 1st Mann. (Mich.) 142; *Bennett*

v. *Williamson*, 4 Sandf. 60; *Arrement* v. *Morrenda*, 8 Blackf. 427; *Moore* v. *Bennett*, 33 Howard, 179; *Maynard* v. *Fireman Co.*, 34 Cal. 48; *Hunt* v. *Bennett*, 4 E. D. Smith, 663.


By the Court, CROCKETT, J.:

The defendants, being the publishers and proprietors of a newspaper, permitted to be published therein an article concerning the plaintiff, which is claimed to be libelous. The action is for damages for the publication of the alleged libel.   The answer admits the publication, but does not aver its truth, and alleges that it was published as a mere pleasantry, and without malice.   It further avers that, as soon as practicable, the defendants published in the same newspaper a full retraction and explanation of the offensive article, and denies that the plaintiff suffered any damage.

The plaintiff submitted the case to the jury on the pleadings, and the only testimony for the defense was that of one of the defendants, who testified to the exculpatory matter set up in the answer, and denying that the publication was malicious.   This being all the evidence, the Court of its own motion charged the jury, that the publication was libelous, as tending "to reflect shame upon the person of the plaintiff," and "to hold him up to the people as an object of ridicule."   We agree with the Court below on this point.   But the charge then proceeds to inform the jury that "malice is of two kinds—malice in law and malice in fact.   If a man does what he ought not to do, or what the law prohibits him from doing, it is a wrongful act; and malice, in law, is simply the wrongful intent which the law always implies accompanies a wrongful act, without any proof of malice in fact.   On the other hand, malice in fact is a spiteful or rancorous disposition which causes an act to be done for mischief."   The court then proceeded to say that the plaintiff was, *prima facie*, entitled to judgment on the pleadings; but that the legal presumption of malice may be repelled by the circumstances under which the publication was made; "and if they show that there was no malice in fact in making the publication there can be no recovery,

unless it is proved that the plaintiff has been specially injured, or that the defendants were actuated by malice in fact.  The Court then recited the circumstances under which the publication was made, as shown by the uncontradicted testimony for the defendants, and instructed the jury that inasmuch as the presumption of malice was fully rebutted, and there was no proof of special damage, it was the duty of the jury to find a verdict for the defendants; which was accordingly done.

This portion of the charge was erroneous.  If a publication be libelous, and not privileged, the law implies that it was malicious.  This is not a mere presumption, which may be wholly overcome by proof, but it is a legal conclusion, which cannot be rebutted.  But whilst the absence of actual malice cannot be shown as a bar to the action, the defendant may plead and prove "any mitigating circumstances to reduce the amount of damages."  This was authorized by Section 63 of the Practice Act, which was in force when this action was tried.  In *Wilson* v. *Fitch*, 41 Cal. 380, the rule is thus laid down:  "The mitigating circumstances which are permitted by Section 63 of the code to be pleaded and proved, must be such as tend to rebut the presumption of. malice, or to reduce its degree.  All libels are conclusively presumed to be, in some degree, malicious; but there are different degrees and phases of malice; and some actionable defamatory publications (all of which the law deems to be malicious, except privileged communications) are, in fact, published without actual malice.  It is eminently just, therefore, that the defendants, with a view to reduce the damages, should be allowed to rebut the presumption of malice by the proof of what the statute terms 'mitigating circumstances.'  That is to say, the circumstances under which the publication was made, and the real motives which induced it."  The testimony on behalf of the defendants was, therefore, proper, in mitigation of damages, but not in bar of the action.  Counsel insist, however, that the plaintiff was entitled, at most, to only nominal damages; and that it is not the practice of appellate Courts to reverse a judgment for the defendant when.

it is clear that only nominal damages can be recovered on another trial. The rule may, possibly, be as stated in actions *ex contractu,* when, for the mere technical breach of a contract, the Court can see that, as a matter of law, the plaintiff would be entitled to only nominal damages. But in an action for libel, the question of damages is for the jury, and the Court cannot assume, as a matter of law, that the plaintiff is entitled to only nominal damages.

Judgment reversed, and cause remanded for a new trial. Remittitur forthwith.