[No. 11511. Department Two. December 31, 1913.]

HULET M. WELLS, *Appellant*, v. TIMES PRINTING COMPANY, *Respondent*.[1]

LIBEL AND SLANDER—WORDS LIBELOUS PER SE—WHAT CONSTITUTES. Newspaper articles plainly intended to bring a person into public hatred, contempt, or ridicule, are libelous *per se*, although not attacking him in his business or profession, or charging him with an infamous crime.

SAME—WORDS LIBELOUS PER SE—SPECIAL DAMAGES—PLEADING—COMPLAINT—SUFFICIENCY. Newspaper articles are libelous *per se* without alleging special damages, where they falsely and maliciously charge plaintiff with the violation of a statute defining the public desecration or disrespect of the United States flag, and calls him a "redtinted agitator" voicing "constructive sedition and treason" and wantonly "insulting the symbol of patriotic allegiance," and declaring that there was a public clamor for his prosecution; and the complaint in such case requires no innuendo to construe the same as intending to bring him into public hatred, contempt and ridicule.

Appeal from a judgment of the superior court for King county, Dykeman, J., entered May 8, 1913, dismissing an action for libel, upon sustaining a demurrer to the complaint. Reversed.

*Roney & Loveless*, for appellant, contending, among other things, that the publication was libelous *per se*, cited: 25 Cyc. 250; 18 Am. & Eng. Ency. Law (2d ed.), 909-912; *Byrne v. Funk*, 38 Wash. 506, 80 Pac. 772; *Lewis v. Daily News Co.*, 81 Md. 466, 32 Atl. 246, 29 L. R. A. 59; *Cerveny v. Chicago Daily News Co.*, 139 Ill. 345, 28 N. E. 692, 13 L. R. A. 864; *Street v. Johnson*, 80 Wis. 455, 50 N. W. 395, 27 Am. St. 42, 14 L. R. A. 203; *McAllister v. Detroit Free Press*, 76 Mich. 338, 43 N. W. 431, 15 Am. St. 318; *Riley v. Lee*, 88 Ky. 603, 11 S. W. 713, 21 Am. St. 358; *Morey v. Morning Journal Ass'n*, 123 N. Y. 207, 25 N. E. 161, 20 Am. St. 730, 9 L. R. A. 621; *Price v. Conway*, 134 Pa. St. 340, 19 Atl. 687, 19 Am. St. 704, 8 L. R. A. 193;

[1]Reported in 137 Pac. 457.

*World Pub. Co. v. Mullen,* 43 Neb. 126, 61 N. W. 108, 47 Am. St. 737; *Collins v. Dispatch Pub. Co.,* 152 Pa. St. 187, 25 Atl. 546, 34 Am. St. 636; *Wood v. Boyle,* 177 Pa. St. 620, 35 Atl. 853, 55 Am. St. 747; *Wilkes v. Shields,* 62 Minn. 426, 64 N. W. 921; *McMurry v. Martin,* 26 Mo. App. 437; *Massuere v. Dickens,* 70 Wis. 83, 35 N. W. 349; *Moley v. Barager,* 77 Wis. 43, 45 N. W. 1082; *Allen v. News Pub. Co.,* 81 Wis. 120, 50 N. W. 1093; *Buckstaff v. Viall,* 84 Wis. 129, 54 N. W. 111; *Goldborough v. Oram & Johnson,* 103 Md. 671, 64 Atl. 36; *Stewart v. Swift Specific Co.,* 76 Ga. 280, 2 Am. St. 40; *Augusta Evening News v. Bradford,* 91 Ga. 494, 17 S. E. 612, 44 Am. St. 53, 20 L. R. A. 533; *Smith v. Smith,* 73 Mich. 445, 41 N. W. 499, 16 Am. St. 594, 3 L. R. A. 52; *Paxton v. Woodward,* 31 Mont. 195, 78 Pac. 215, 107 Am. St. 416; *Moore v. Francis,* 121 N. Y. 199, 23 N. E. 1127, 18 Am. St. 810, 8 L. R. A. 214; *Monson v. Lathrop,* 96 Wis. 386, 71 N. W. 596, 65 Am. St. 54; *Trebby v. Transcript Pub. Co.,* 74 Minn. 84, 76 N. W. 961, 73 Am. St. 330; *Triggs v. Sun Printing & Pub. Ass'n,* 179 N. Y. 144, 71 N. E. 739, 103 Am. St. 841, 66 L. R. A. 612; *Upton v. Hume,* 24 Ore. 420, 33 Pac. 810, 41 Am. St. 863, 21 L. R. A. 493; *McDuff v. Detroit Evening Journal,* 84 Mich. 1, 47 N. W. 671, 22 Am. St. 673; *Wofford v. Meeks,* 129 Ala. 349, 30 South. 625, 87 Am. St. 66, 55 L. R. A. 214. An article may be libelous *per se* without attacking the person in his business or profession. *Upton v. Times-Democrat Pub. Co.,* 104 La. 141, 28 South. 970; *Flood v. Evening Post Pub. Co.,* 71 S. C. 122, 50 S. E. 641; *Morey v. Morning Journal Ass'n,* 123 N. Y. 207, 25 N. E. 161, 20 Am. St. 730, 9 L. R. A. 621; *Moore v. Francis,* 121 N. Y. 199, 23 N. E. 1127, 18 Am. St. 810, 8 L. R. A. 214; *Triggs v. Sun Printing Pub. Ass'n,* 179 N. Y. 144, 71 N. E. 739, 103 Am. St. 841, 66 L. R. A. 612; *Lathrop v. Sundberg,* 55 Wash. 144, 104 Pac. 176, 25 L. R. A. (N. S.) 381; *Elmergreen v. Horn,* 115 Wis. 385, 91 N. W. 973; *White v. Nichols,* 44 U. S. 3; *Lewis v. Daily News Co.,* 81 Md. 466, 32 Atl.

246, 29 L. R. A. 59; *Cerveny v. Chicago Daily News Co.*, 139 Ill. 345, 28 N. E. 692, 13 L. R. A. 864; *Wilkes v. Shields*, 62 Minn. 426, 64 N. W. 921; *Call v. Larabee*, 60 Iowa 212, 14 N. W. 237; *Buckstaff v. Viall*, 84 Wis. 129, 54 N. W. 111.

*Bausman & Kelleher*, for respondent, contended, *inter alia,* that there was no direct accusation against the plaintiff, and the words were not libelous *per se*: *Wright v. Daniel*, 40 Wash. 6, 82 Pac. 139; *Dunlap v. Sundberg*, 55 Wash. 609, 104 Pac. 830, 133 Am. St. 1050; *McClure v. Review Pub. Co.*, 38 Wash. 160, 80 Pac. 303; *De Fronsac v. News Co.* (R. I.), 35 Atl. 1046; *Diener v. Star-Chronicle Pub. Co.,* 232 Mo. 416, 135 S. W. 6; *Byrne v. Funk*, 38 Wash. 506, 80 Pac. 772; *Stone v. Cooper*, 2 Denio (N .Y.) 293; *Urban v.* *Helmick*, 15 Wash. 155, 45 Pac. 747; *Velikanje v. Millichamp*, 67 Wash. 138, 120 Pac. 876; *Ulery v. Chicago Live Stock Exchange*, 54 Ill. App. 233; *Clarke v. Fitch*, 41 Cal. 472; *Goldberger v. Philadelphia Grocer Pub. Co.*, 42 Fed. 42; *Galveston Tribune v. Guisti* (Tex. Civ. App.), 134 S. W. 239.

MORRIS, J.—Appellant brought an action against respondent, charging it with libel in publishing certain articles of and concerning him. In the second amended complaint, three causes of action, based upon three publications, were set forth. These articles were set forth in full as published, to which was added an allegation that they were wholly false and maliciously published for the purpose of injuring appellant in his reputation and to expose him to public hatred, contempt, ridicule, and disgrace. A demurrer was interposed to this complaint, which was sustained upon the ground that the articles complained of were not libelous *per se*, appellant having failed to charge any special damage. Appellant electing to stand upon his second amended complaint, judgment of dismissal was entered, and he appeals.

These articles were as follows:

(1) "DENOUNCING FLAG AS DIRTY RAG MAY COST WELLS
CITIZENSHIP.

"CHIEF EXAMINER OF NATURALIZATION BUREAU TAKES UP
ALLEGED STATEMENTS OF SOCIALIST MAYORALTY
CANDIDATE.

"Having heard that Hulet M. Wells, candidate for the mayoralty on the Socialist ticket at the last municipal election, and at present a civil service employee of the city in the lighting plant, had been reported to say this morning that the Stars and Stripes was a dirty rag, and that his sympathies were all with the paraders of last evening, proceedings were begun today by Chief Examiner John Speed Smith, of the government naturalization bureau, to revoke his rights of citizenship, if it can be shown he is not a native born citizen.

"Following close upon the declaration of fellow employees that he had made life almost unbearable at the lighting plant during the recent agitation over the red flag and that today, particularly, he had made numerous vicious statements concerning government and respect for law, formal complaint was registered with the naturalization bureau and investigation into his record begun.

"Complaints were registered both with the naturalization bureau and with the office of the United States marshal. After the evidence had been transferred to a special agent of the department of justice, he laid it before Chief Examiner Smith, with recommendation that Wells be prosecuted if it be found that the statements actually had been made by him.

"It is feared by the government that it will be impossible to reach him through the federal courts, inasmuch as it is believed that he is a native-born citizen. In that case it will be necessary to take the case into the state courts.

"Naturalization can only be revoked when an alien has been found guilty of sedition at the time he took his oath of allegiance, and no American-born citizen can be attacked in this way for expounding treasonable views.

"In case it is found that he is a native-born, the evidence will be referred to Prosecuting Attorney John F. Murphy, with request on the part of the government that he be prosecuted by the state. Such action could be taken under the statute prohibiting insults to the Stars and Stripes.

"Wells at one time was a civil service employee of the

United States in the postoffice. He is also known to have been at one time a student of the State University. At present he is under civil service working for the city; and if necessary to reach him, formal complaint against him will be made to the Civil Service Commission by the government."

(2) "Needed Evidence Supplied Murphy.

"Hulet M. Wells, one-time candidate for the mayoralty on the Socialist ticket, former student at the State University and later employed for a time in the Seattle postoffice, will be the first to be prosecuted by the state for public disrespect of the American flag, if Prosecuting Attorney John Murphy fulfills his pledge to the people of Seattle, made Friday afternoon.

"Names of two witnesses, fellow-employes of Wells, at the municipal lighting plant, who informed government officials Thursday of last week that his insults towards the flag had become unbearable, were obtained yesterday by Secretary Robert McCormick of the Spanish War Veterans in this city, and will be turned over to the prosecuting attorney tomorrow.

"This will be done in accordance with the request of Mr. Murphy to the veterans that all tangible evidence as to public acts against the American Flag be given to him for examination and prosecution. This request was conveyed in an interview between Murphy and McCormick Friday afternoon.

"At the time the matter was reported to United States Marshal J. R. H. Jacoby, and later to the department of justice and the government naturalization bureau, the employees stated that Wells had called the flag a 'dirty rag,' and that his taunts had become more than they could endure peaceably.

"The matter was immediately taken up by Chief Examiner John Speed Smith of the naturalization bureau, in order to deprive Wells, if possible, of his citizenship; but it was found that he had been born in Skagit county, and, being native-born, is therefore beyond the reach of the United States officers so far as revocation of citizenship is concerned.

"The statute under which prosecution may be carried forward defines the public desecration or disrespect of the Stars and Stripes as a misdemeanor. The law was put into effect in 1909, and so far as is known has never been made the basis of prosecution in King county before."

(3) "$10,000 Suit Brought Against Times by Man Who Reviled U. S. Flag.

"Hulet M. Wells, Who Denounced Old Glory as 'Dirty Rag' Peeved by News Articles in This Paper.

"In an effort to capitalize notoriety achieved through revilement of the American flag, Hulet M. Wells, redtinted agitator and whilom socialist, yesterday brought suit against the Times Publishing Company for $10,000, in which amount, he represents, he was damaged by news stories published in this newspaper. One of these published May 2 of this year, is headed 'Denouncing the Flag as Dirty Rag May Cost Wells Citizenship.' The other, published May 5, headed: 'Wells May Be First to Face Local Jury for Insulting Flag.' Both these articles Wells charges constitute libel.

"The incident responsible for the suit came up at the time The Times expressing the sentiment of an outraged American citizenship against I. W. W. outrages, and constructive sedition and treason, voiced in the rantings of characters of the Wells stripe, turned a drenching stream of publicity upon the fire of incipient revolution. This newspaper vigorously attacked the sources responsible for the menace to the city's and country's well being, and by confining the flames to the narrow confines of their origin and maintaining a relentless warfare upon them, stamped out the whole movement.

"The I. W. W. element was virtually kicked out of town through sheer force of public sentiment. A few of the Wells ilk and other opportunists seeking reputations as radical agitators took advantage of the opportunity to obtain some of the yellow publicity so important to the success of efforts to win leadership in the rag-tag forces they lead. They jumped into the fray and elbowed the I. W. W.'s aside so that some of the newspaper flaying might descend upon their own shoulders.

"Wells, in particular, made a spectacular show of himself. He outranted the I. W. W.'s and leaped beyond the last border of unloyalty and indecency they had established by denouncing Old Glory as a 'dirty rag.'

"This despicable act brought a cry of protest from all quarters, and citizens urged federal and county authorities to invoke criminal laws against him.

"The Times printed the truth about the whole nasty affair, handling Wells without gloves.

"In the complaint of his suit, Wells declares the publications were 'malicious and with the purpose of injuring plaintiff, exposing him to hatred and contempt of the people, and depriving him of the benefit of public confidence and social intercourse and bringing him into disrepute among his friends and neighbors and with others of the social organization and party and the people at large of the city of Seattle and the state of Washington.'

"SOME POINTS MISSING.

" 'The people' to whom Wells refers in his complaint, with inconsiderable exception, are Americans, every one of whom loves, honors and respects the Stars and Stripes. How Wells possibly could figure that he possessed any 'public confidence' of these people which he might be deprived of, after he had wantonly insulted the symbol of a patriotic allegiance they treasured above all else, is not set forth.

"Among interesting observations of the complaint's preamble—interesting when the truth about the crooks and turns of the Wells character is known—are his declarations that he 'holds a prominent and influential place in the Socialist party.' As a matter of fact, the most active agents in the discrediting and denunciation of Wells at the present time are members of the Socialist party. They claim that he has been kicked out of the regular ranks of their organization.

"The two articles that Wells is using as the basis of his suit are republished in full herewith. The first publication in the Times of May 2, 1912, under the heading, 'Denouncing Flag as Dirty Rag May Cost Wells Citizenship.' " (Here follow the first and second articles as above quoted.)

The respondent, by its demurrer, admitting the false and malicious character of the publications, it only remains for us to decide whether or not, in the absence of a plea of special damage, the words so published are actionable as libelous *per se*. In *Quinn v. Review Pub. Co.*, 55 Wash. 69, 104 Pac. 181, 133 Am. St. 1016, matter libelous *per se* is defined as any publication which falsely and maliciously tends to bring an individual into public hatred, contempt, or ridicule, or charges an act odious and disgraceful in society, including whatever tends to injure the character of an individual or blacken his

reputation, or imputes fraud, dishonesty, or other moral turpitude, or reflects shame, or tends to put him without the pale of social intercourse. In *Lathrop v. Sundberg*, 55 Wash. 144, 104 Pac. 176, 25 L. R. A. (N. S.) 381, in defining matter libelous *per se*, it is said it is enough if the words are of such a nature that the court can presume as a matter of law that they will tend to disgrace the party of whom they are published, or hold him up to public ridicule or contempt, or, cause him to be shunned or avoided. In *Triggs v. Sun Printing & Pub. Ass'n*, 179 N. Y. 144, 71 N. E. 739, 103 Am. St. 841, 66 L. R. A. 612, it is said any publication which exposes another to public hatred, contempt, scorn, obloquy, or shame, is libelous *per se*. In *Riley v. Lee*, 11 Ky. Law 586, 11 S. W. 713, matter libelous *per se* is said to be that which tends to render an individual odious, ridiculous, or contemptible in the estimation of the public, or brings him into public disgrace. Other citations will not be necessary to establish the correctness of these definitions. They are too well established in the law and have been recognized too long to be now doubted or questioned.

We come, therefore, to the main question submitted by this appeal, Do these several publications, as set forth in this second amended complaint, fall within the rule stated? And in answering this question in the affirmative, we confess our inability to understand the reasoning which holds they do not; for it seems to us these publications are so plainly libelous *per se* as to admit of no question. Respondent supports the ruling on the demurrer by contending, that in none of the articles is there any direct accusation against appellant; that they merely purport to be the theories and proceedings of agents of the Federal government, in stating that certain things had been reported and that an investigation was to be made and, if upon such investigation these reports were found to be true, certain proceedings might be had; and it is also contended that (1) there is no attack upon appellant in his business or profession, and (2) no charge against him of

having committed an infamous crime.   No case is cited, and we are confident none can be found, restricting matter libelous *per se* within these two last limitations.   It might be that, if there was no allegation of express malice, the language of the first two articles might be construed as the publication of a news item, as what was contemplated by the public officials and the ground for their proposed action, and thus bring the case within the rule of *McClure v. Review Pub. Co.*, 38 Wash. 160, 80 Pac. 303, in which the article there published was held to be not libelous *per se* because of its lack of statement of whether or not the plaintiff was guilty of the crime with which she was charged, and purported only to be a statement of the acts and representations of the peace officers in relation to the pursuit, arrest, trial, and acquittal of the plaintiff; it being there said that, while certain of the expressions there used, if construed without reference to the whole publication, might be held to be libelous *per se*, yet when read as a whole, there being no charge of malice nor anything in the articles themselves or in the circumstances surrounding the publication to indicate malice, the libelous character of the publication could not be established.

It will not be necessary to here determine whether, as applied to these first two publications if standing alone, this rule could be invoked to sustain the demurrer, for the publication of the third article with the reproduction of the first two, and its evident purpose and intent as plainly indicated as it is possible for language to express, robs the *McClure* case of any application to the question before us. For in this third publication, as distinguished from the *McClure* case, is found a direct charge of guilt of the offense referred to in the second publication.   Not only referred to, but the second publication goes further, in giving the names of the witnesses by whom the offense can be established, and making special reference to the statute which defines it to be a crime.   Whatever then may have been the purpose of the first two articles, the third is a direct personal charge

against appellant as a "man who reviled U. S. flag," "who denounced Old Glory as a dirty rag," a "redtinted agitator," voicing "constructive sedition and treason," leaping "beyond the last border of unloyalty and indecency" by "denouncing Old Glory as a dirty rag," and "wantonly insulted the symbol of a patriotic allegiance." Such language requires no innuendo to construe its meaning as intending to bring the individual of whom it is written into public hatred, contempt, and ridicule, expose him to public obloquy, scorn, and shame, and cause him to be shunned and avoided by his fellows. The third article leaves no room for any doubt as to its purpose to so characterize the appellant and his acts and the effect produced upon the public mind; for it says, "This despicable act brought a cry of protest from all quarters and citizens urged Federal and county authorities to invoke the criminal laws against him." What else need be said as to the effect upon the public mind of the publications complained of, when the publication itself refers to the public as so inflamed against appellant that citizens from all quarters urged the public authorities to invoke the criminal laws against him, thus not leaving to inference or presumption that the ordinary effect of the language used in the publications would hold appellant up to public hatred, contempt, scorn, and shame; but expressly charging that appellant was so regarded to the extent of a public demand that criminal laws be invoked against him.

Respondent justifies the judgment further by referring to *Urban v. Helmick*, 15 Wash. 155, 45 Pac. 747, where it was said that to call one a hog is not libelous *per se*, as such language does not expose the one of whom it was spoken "to public hatred or contempt in the sense or to the degree required by the law of libel." There is no comparison between the language used in the *Urban* case and that used in the articles under discussion, and conceding that that case binds us to the rule there announced as applicable to the language there used, we cannot extend such immunity to the language

here used.   Nor is *Velikanje v. Millichamp*, 67 Wash. 138, 120 Pac. 876, also relied upon by respondent, an authority for its contention.   The language there used was: "You will kindly excuse delay, caused by one Velikanje presenting us with forged receipts purporting to be from our agent at your city, and trying to collect your money on them."   It was held that this language did not charge the crime of forgery or of uttering a forged instrument, because it imputed neither criminal intent nor guilty knowledge.   It is evident that the meaning of the language there used is that one can innocently make use of a forged instrument, and the mere fact of use does not imply that the use was made with a guilty knowledge of the character of the paper, nor with the intent to commit a crime; nor would the law presume guilty knowledge or criminal intent in the absence of any language from which it could be legally inferred.   As applied to the case before us, that rule would mean that we will not presume the language used in these articles complained of has a tendency to so expose plaintiff to public ridicule, contempt, hatred, scorn, and shame as to make them libelous *per se* in the absence of language plainly indicating such tendency, or when the words used could be so used without any such effect.   It is possible to pass a forged instrument without criminal intent or guilty knowledge, but it is not possible to use the language here complained of without subjecting the one of whom it is written to public hatred, contempt, and scorn, or avoiding the belief that such was the very purpose of the publication. And herein lies the manifest distinction between the two cases.

If we are to decide the question before us with reference alone to our own decisions, without any reliance upon the legal principles involved, reference might be made to *Bryne v. Funk*, 38 Wash. 506, 80 Pac. 772, where it was held that a publication calling a county commissioner "a liar and poltroon" was libelous *per se*.   Also *Quinn v. Review Pub. Co.*, *supra*, where an article charging one with being party to a system of municipal jobbery and graft was held libelous *per*

*se;* and *Lathrop v. Sundberg, supra,* where a letter insinuating that a physician was not a reputable physician and classing him with criminal practitioners, patent medicine fakirs, and quacks, was held actionable without any charge of special damage. True, in each of those cases it might be said the charge was made concerning an individual in his official or professional capacity, and that words so used might be held to be libelous *per se* when they would not be so held if written of one in his individual capacity. Conceding such a rule, those cases more than support our view that the language here used is actionable without allegation or proof of special damages. We cannot escape the conviction that the respondent's demurrer should have been overruled. The judgment is reversed.

CROW, C. J., FULLERTON, MOUNT, and PARKER, JJ., concur.