[No. 25853.  *En Banc.*  July 13, 1936.]

FELIX LUNA DE LA PEUNTE, *Respondent,* v. SEATTLE TIMES COMPANY, *Appellant.*[1]

[1]Reported in 59 P. (2d) 753.

*Todd, Holman & Sprague* and *Clarence R. Innis* (*Lowell P. Mickelwait,* of counsel), for appellant.

*Green & Burnett,* for respondent.

BLAKE, J.—On the front page of two editions of The Seattle Times for March 16, 1934, under a double column head, was printed the following:

"CONSUL'S GAY PARTY
WINDS UP AS GIRLS
STEAL CLOTHES, CASH

"Fellow consuls and friends of Fernando Bercke-meyer-Pazas, Peruvian consul here, gave a farewell party for him last night at the Washington Athletic Club. The party ended at 5:30 o'clock this morning when Felix Luna, Peruvian ·consul at Vancouver, B. C., telephoned police and said two women, 'unin-

vited guests,' had left with clothing, $200 and jewelry belonging to Mr. Berckemeyer-Pazas.

" 'It was a great party,' Mr. Luna recalled today, as he 'convalesced' at the Mayflower Hotel.

" 'Mr. Carlos Grant, the Chilean consul in Seattle, arranged it,' Mr. Luna said. 'Mr. Berckemeyer-Pazas, you see, is going to San Francisco Monday to be Peruvian consul-general for the Pacific Coast. That is a very fine job.'

"Mr. Luna had a towel on his forehead as he talked. Luis Navarro, Portland, Or., importer and former Peruvian consul there, sat nearby. He also attended the party, and his diet today consisted of aspirin tablets and ice water.

"Edmundo Chocano, former Peruvian vice consul here, also was in Mr. Luna's room. He had been unable to attend the party. He was consoling Mr. Luna and Mr. Navarro, while he tried to decide whether he was glad or sorry he missed the party.

" 'There were thirteen of us,' Mr. Luna said. 'That is an unlucky number in this country, eh? There was Mr. Grant. Then there were Mr. Otto Strizek, the consul for Czecho-Slovakia, and Mr. Carlos Garcia-Prada, the University of Washington professor.'

"The party started with a seven-course dinner at $3.50 a plate, with extra service of Manhattan cocktails, burgundy, champagne and cognac. Then the party moved up to the twenty-first floor.

" 'We had several kinds of very nice liquor there,' Mr. Navarro said. 'Then some gentlemen arrived. I did not know them. They brought two women with them.'

" 'Very early this morning,' Mr. Luna remarked, 'Mr. Berckemeyer-Pazas discovered his money was gone. Also some of his clothes and some jewels. The women were gone, too.'

"*Sorry for Honor Guest*

"Mr. Luna said all the guests felt very sorry, because Mr. Berckemeyer-Pazas was the guest of honor, and it is not proper for the guest of honor to lose his money and things.

" 'We hope Mr. Berckemeyer-Pazas does not have to walk to San Francisco,' Mr. Luna said.

"Then he put a fresh towel on his forehead. Mr. Navarro took another aspirin. Mr. Chocano said he was very sorry for everyone.

"Last night's party followed a day spent at the Carnation Farm, where the consular group drank milk from 'contented cows' and learned dairying from the pasture up."

Shortly thereafter, alleging the article to be libelous, plaintiff instituted this action for damages.

On April 17, 1934, in an equally prominent position, there was printed, by way of retraction, the following:

"PRACTICAL JOKE
DUMPS TROUBLES
IN CONSUL'S LAP

"PLAYFUL IDEAS OF COMPANIONS CAUSE EMBARRASSMENT
TO FELIX LUNA; THE TIMES CORRECTS ERRORS
FROM POLICE REPORT

"It was just a practical joke. Nothing was really stolen from the room of Fernando Berckemeyer-Pazas, former Peruvian consul here, after a farewell dinner in his honor the evening of March 15 in the Washington Athletic Club, according to a report on file with the police today.

"The missing articles were found next day in the pocket of a guest at the dinner, according to the report. The practical joke was as much on the guest as it was on Mr. Berckemeyer-Pazas, because neither knew who dropped the articles in his pocket.

"But the joke caused no end of trouble to Mr. Berckemeyer-Pazas, Mr. Felix Luna, Peruvian consul at Vancouver, who was also a guest at the dinner; the Seattle Police Department, and The Seattle Times, which printed an article about the purported theft.

"Mr. Luna became involved when Mr. Berckemeyer-Pazas, upon discovering his loss several hours after the dinner, telephoned him. Mr. Luna promptly notified police in good faith. Police started an investigation. A Times reporter read Mr. Luna's report and went to the Mayflower Hotel, where Mr. Luna was staying, to interview him.

"But the reporter didn't get any of the details of

the dinner or the purported theft from Mr. Luna. Instead, the reporter interviewed another guest at the party, who was staying in a room adjoining Mr. Luna's at the Mayflower Hotel.

"However, due to a confusion of identity, the name of Mr. Luna was inserted in the article, printed in The Times March 16, as giving the interview. Mr. Luna gave no interview.

"The Times article reported:

" ' "It was a great party," Mr. Luna recalled today, as he convalesced at the Mayflower Hotel.'

"The insertion of Mr. Luna's name in this sentence instead of the name of the guest who gave the interview was in error.

"The article further reported that 'Mr. Luna had a towel on his head as he talked' and that during the interview 'he put a fresh towel on his head.' Mr. Luna did not have a towel on his head.

"The original police report on the purported theft, reprinted in the article, stated that clothing had been stolen from Mr. Berckemeyer's room. No clothing was involved in the prank.

"And thus endeth the report of a series of errors which followed a playful desire of well-wishing friends. No hits, no runs, all errors."

Thereafter, defendant answered the complaint and set up two affirmative defenses, as follows: First, defendant alleged that the facts appearing in the article of March 16th were true and correct statements of facts ascertained from an interview with Navarro, who should have been described as the speaker instead of plaintiff; second, defendant, in mitigation of damages, set up the article published in the paper of April 17th.

The cause was tried to a jury, which returned a verdict for $7,500. From judgment entered on the verdict, defendant appeals. The errors assigned will be discussed under the following heads: *First,* the sufficiency of the evidence to make a case for the

jury; *second,* the admissibility of certain evidence; *third,* certain instructions given and certain instructions requested and not given; *fourth,* excessiveness of the verdict.

*First:* Since respondent did not allege special damage, the first question is presented in two phases: (a) Was the article of March 16th libelous *per se?* (b) Were the facts stated therein true? If the article of March 16th was libelous *per se,* respondent is entitled to substantial damages without alleging or proving special damage. *Dick v. Northern Pac. R. Co.,* 86 Wash. 211, 150 Pac. 8, Ann. Cas. 1917A, 638; *Cyclohomo Amusement Co. v. Hayward-Larkin ·Co.,* 93 Wash. 367, 160 Pac. 1051. In order to constitute a civil libel *per se,* it is not necessary that the words published involve an imputation of crime. *Lathrop v. Sundberg,* 55 Wash. 144, 104 Pac. 176, 25 L. R. A. (N. S.) 381. A publication will be held to be libelous if it tends to render a person odious, ridiculous, or contemptible in the estimation of the public, or brings him into public disgrace. *Wells v. Times Printing Co.,* 77 Wash. 171, 137 Pac. 457.

In determining whether or not the published matter is libelous *per se,* the article is to be read as a whole. *Graham v. Star Pub. Co.,* 133 Wash. 387, 233 Pac. 625. Now, taking this article of March 16th by its four corners, we fail to see how it could have any other effect than to hold respondent up to public scorn, ridicule and disgrace. The fact that it was published without malice does not diminish its effect nor relieve appellant of liability. *McKillip v. Grays Harbor Pub. Co.,* 100 Wash. 657, 171 Pac. 1026.

An examination of the cases heretofore cited will show that articles having much less tendency to hold one up to public scorn and disgrace have been held libelous *per se.* While none of our own cases in-

volves publications attributing to one untrue statements, actually not made by him, such cases are plentiful from other jurisdictions. Publications of such character, far less offensive than the article of March 16th, have been held libelous *per se. Foster-Milburn Co. v. Chinn*, 134 Ky. 424, 120 S. W. 364, 135 Am. St. 417, 34 L. R. A. (N. S.) 1137; *Wiley v. Oklahoma Press Pub. Co.*, 106 Okla. 52, 233 Pac. 224; 40 A. L. R. 573; *Lick v. Owen*, 47 Cal. 252; *Morse v. Star Co.*, 118 App. Div. 256, 103 N. Y. S. 496; *Snyder v. New York Press Co.*, 137 App. Div. 291, 121 N. Y. S. 944; *Munden v. Harris*, 153 Mo. App. 652, 134 S. W. 1076.

With respect to the truth of the article of March 16th, appellant admitted that respondent did not give the purported interview. It also admitted that respondent did not have a towel on his head nor call for another at the time of the purported interview. Furthermore, although appellant alleged in its answer that the interview as reported was, in fact, given by Navarro and Chocano, no proof was offered in support of the allegation. Neither the reporter who was supposed to have had the interview nor the re-write man in the office who wrote the story was called. So far as the evidence in the case shows, the whole story was a fabrication of their imaginations, based upon a report to the police made by appellant at 5:30 A. M., March 16th, of the theft of

" . . . money, clothing & jewelry fm room of the Peruvian counsel at Seattle at 2001 Washington Athletic Club Bldg by a couple of women. . . ."

To substantiate the truth of the article, appellant offered evidence of the events of the evening of the party. It undertook to prove that there was much to drink and that respondent got drunk; that, after the banquet, the guests repaired to the room of Berckemeyer-Pazas, where two women shortly joined

them. Respondent admitted the presence of the women, and that cocktails and wine were served at the banquet, and whiskey afterward. He denied, however, that he was drunk, or that he had a hangover next morning.

Upon this evidence, we think the question of the truth of the article and its effect was for the jury. Taking the article as a whole, it purported to be an interview with respondent. As such, it was wholly false. The fact that true statements were interspersed through the story makes it none the less libelous *per se* or damaging in its effect. Nor do such true statements relieve appellant from liability. *Hubbard v. Allyn,* 200 Mass. 166, 86 N. E. 356. What was said in *Snyder v. New York Press Co.,* 137 App. Div. 291, 121 N. Y. S. 944, is peculiarly pertinent here:

"An article may be libelous, though it does not impute immoral conduct. The whole tenor of this article is to ridicule the plaintiff. It has a direct tendency to lower her in the estimation of the community, though it may not charge immoral conduct, or impute immoral character. . . .

"The defendant contends that the article is innocent and belongs to a class generally recognized as having a 'news value.' It is difficult to perceive what news value it can have, and impossible to discover its literary value. If newspapers see fit to give their readers fiction as news, they do so at their peril. Such an article should not be held harmless unless in the language of Judge MARTIN, in the *Triggs* case, it is 'perfectly manifest' that it is."

*Second:* Respondent was permitted to testify that, when he got back to Vancouver, his wife was so incensed over the report of his purported conduct in Seattle that she would not have anything to do with him; that she became somewhat mollified before the retraction was published on April 17th, but that then her anger broke out again, with the result that,

on May 7, 1934, she left him to return to her home in Peru; that he has never seen her since.

It is, of course, well settled that one cannot recover damages on account of the humiliation, chagrin and mental suffering of members of his family. *Dennison v. Daily News Pub. Co.,* 82 Neb. 675, 118 N. W. 568, 23 L. R. A. (N. S.) 362. On the other hand, it is equally well settled that evidence of aversion, contempt or hatred, manifested, as a consequence of a libelous publication, by one's friends or acquaintances, is competent to show the hurtful tendency of the defamatory words. *Cyrowski v. Polish-American Pub. Co.,* 196 Mich. 648, 163 N. W. 58; *Merchants' Ins. Co. v. Buckner,* 98 Fed. 222; *Hubbard v. Allyn,* 200 Mass. 166, 86 N. E. 356; *Zambory v. Csipo,* 3 N. J. Misc. 153, 127 Atl. 573; *Warren v. Pulitzer Pub. Co.,* 336 Mo. 184, 78 S. W. (2d) 404; *Lowe v. Brown,* 114 Ore. 426, 233 Pac. 272, 235 Pac. 395; *Bishop v. New York Times Co.,* 233 N. Y. 446, 135 N. E. 845. In the last cited case, the court said:

"We are inclined to the view that a plaintiff is not compelled to rely upon a favorable presumption with which the law endows his cause of action but that he may prove if he can that he has been avoided and shunned by former friends and acquaintances as the direct and well-connected result of the libel."

It was under this rule that the court admitted the evidence relative to the conduct of respondent's wife. It was not for the purpose of permitting recovery for her humiliation and grief, but to show the effect upon respondent himself. Evidence of her contempt, hatred and aversion was just as competent as evidence of such manifestations on the part of any other of his friends or acquaintances. *Earl v. Times-Mirror Co.,* 185 Cal. 165, 196 Pac. 57.

*Third:* The court instructed the jury that, in

an action for libel, the law presumes the reputation and character of plaintiff to be good, and that it is not necessary for him to adduce evidence in support thereof. Respondent offered no evidence on the subject. Appellant produced three witnesses who testified that respondent's reputation and character were bad. Excepting to the instruction on the presumption, appellant makes the usual argument that a presumption is merely a rule of law relating to the order of proof; that it suffices as evidence only until evidence to rebut is received; that it then falls and loses its force completely.

The difficulty, however, lies not so much with the statement of law as with its application. When and by whom is it to be said that the evidence is sufficient to rebut a presumption? In some cases, doubtless, it may be said by the court, as a matter of law. In other cases, it may very properly be left to the jury to say. Simply because some witness takes the stand and swears to facts which, if true, would rebut the presumption, does not require the court to hold, as a matter of law, that the presumption has been rebutted. The quantum and quality of proof sufficient to rebut a presumption differs widely in different classes of cases.

For instance, in a murder case, where the killing is admitted and the presumption follows that defendant is guilty of murder in the second degree, it is error not to instruct the jury on the presumption of innocence. *State v. Tyree,* 143 Wash. 313, 255 Pac. 382. And it is proper to instruct the jury that the presumption of innocence attends the defendant until overcome by the evidence (*State v. Pavelich,* 153 Wash. 379, 279 Pac. 1102) and guilt is proven beyond a reasonable doubt. *State v. Dunn,* 159 Wash. 608, 294 Pac. 217.

In fraud cases, the presumption of honesty and fair dealing must be rebutted by evidence that is clear, cogent and convincing, and it is proper to so instruct the jury. *Biel v. Tolsma,* 94 Wash. 104, 161 Pac. 1047.

The sum and substance of all that has been written on the force and effect of presumptions is that, in the first instance, it is for the court to say whether or not the evidence is sufficient, as a matter of law, to overcome a presumption. If not, the question may be left to the jury, under proper instruction. See: *Knutson v. McMahan, ante* p. 518, 58 P. (2d) 1033.

And so, in the case at bar, it was a correct statement of law for the court to advise the jury as to the presumption of good reputation and good character. At best, the testimony of the witnesses called by appellant to rebut the presumption was hearsay. Without analyzing their testimony, we may say that, on cross-examination, facts were developed from which it might be inferred that each of them was animated by a motive of personal hostility toward respondent. On this record, we think the court very properly left it to the jury to say whether the evidence was sufficient to overcome the presumption of good reputation and good character.

▇ In instruction number six, the court defined libel, and told the jury it was libelous *per se* to publish a statement charging one with being under the influence of intoxicating liquor. In the instruction, the court further charged that it was unnecessary to prove malice. The court then said:

"As to the other matters complained of as being libelous, it is for the jury to say whether the publication tends to expose the plaintiff to hatred, contempt, ridicule, or obloquy, or to deprive him of the benefit of public confidence or social intercourse. And if you find from a preponderance of the evidence that the balance of said article is libelous, then plaintiff is en-

titled to recover such damages, if any, as you find he has sustained.''

It is this portion of the instruction of which appellant principally complains. But we think that this instruction was more favorable to appellant than otherwise. For the court left to the jury something which it should itself have determined, namely, that the article, when read as a whole, was libelous *per se. Graham v. Star Pub. Co., supra; Hubbard v. Allyn, supra.*

■ The court refused to give an instruction requested by appellant as follows:

''If under the evidence you find that plaintiff had in fact over-indulged in intoxicating liquor on the night of March 15, 1934, and on the morning after was suffering from the effects of such over-indulgence, if any, I instruct you that plaintiff may not be awarded damages in any amount in this action and your verdict will be in favor of the defendant.''

The defense of truth was adequately covered by instructions fourteen and fifteen. It was, therefore, not error to refuse to give the above-quoted request.

■ Appellant submitted two requested instructions which the court refused, one directing the jury, in awarding damages, to disregard the fact that respondent's wife and children ''are now living in Peru,'' the other to disregard any evidence tending to show that respondent's wife had left him or that his home had been broken up as a result of the defamatory article. We have already stated that evidence with respect to these matters was admissible. The requested instructions were properly refused. The evidence being admissible, the jury should not be told to disregard it.

■ *Fourth:* The verdict is large, but we find nothing in the record to indicate that the jury was

motivated by passion and prejudice. Appellant calls attention to what it terms inflammatory remarks made by counsel for respondent in his closing argument to the jury. The so-called inflammatory remarks refer to the evidence of the estrangement of respondent's wife and the breaking up of his home. We do not think the remarks went beyond the bounds of legitimate comment on the evidence. Furthermore, there had been a previous trial in which a jury returned a verdict of five thousand dollars. Of a like situation, this court, in *Regenvetter v. Ball,* 131 Wash. 155, 229 Pac. 321, said:

"The question of the amount of the recovery is solely for the jury. The court may not substitute its judgment for the judgment of the jury, however much it may be dissatisfied with the verdict as returned. Its power in this respect is limited to granting another trial, or what is to the same effect, giving the plaintiff an option to accept a lesser sum than the verdict awards or submit to a new trial. But there must be a limitation to the exercise of this power, else it may result, because of the exhaustion of the plaintiff or of his resources, in the denial of any recovery at all. The tribunal the law appoints to measure the plaintiff's recovery has in this instance twice returned awards substantially in the same amount, and nothing in the record indicates that there would be a different result were the plaintiff to be compelled to resort to a third. It is our opinion that an injustice would be done the plaintiff if he is compelled to resort to another trial, and that the judgment should be affirmed."

Judgment affirmed.

MILLARD, C. J., MAIN, MITCHELL, STEINERT, and GERAGHTY, JJ., concur.

BEALS, J. (dissenting)—I am in accord with the foregoing opinion, save as to one phase thereof. It seems to me that the trial court committed reversible

error in admitting testimony to the effect that respondent's wife left him after the publication of the retraction, and that she had not returned prior to the trial. Respondent frankly states that no special damages were alleged or sought. Respondent, then, is limited to general damages, which are "those which the law will presume to be the natural or probable consequences of the defamatory words." Newell on Slander and Libel (4th ed.), p. 810. The same authority (pp. 824-5) defines special damages as "such as the law will not infer from the nature of the words themselves," and which must be specially claimed in the pleadings. Clearly, loss of consortium, if any basis for recovery, is special damage. *Williams v. Hill*, 61 Wend. (N. Y.) 305, and the texts cited above.

It is, of course, elementary that evidence of special damages is inadmissible unless such special damages be alleged in the pleadings. 2 Starkie on Slander, p. 62; Folkard on The Law of Slander and Libel (7th ed.), p. 221; Townshend on Slander and Libel (4th ed.), p. 579.

I am in accord with the majority opinion in so far as the same holds that respondent could testify that his wife was incensed because of the publication which is the basis of this action, not for the purpose of recovering damages in this action for the wife's humiliation, but as bearing upon the effect of the publication upon respondent. It seems to me, however, that when respondent was allowed to go further and testify that his wife had left him, an element was introduced into the case which was highly prejudicial to appellant and which the jury should not have been allowed to consider in awarding damages. An acquaintance or a friend is under no legal obligation to maintain that relation; he can abandon the same for any reason or for no reason. Husband

and wife, on the other hand, owe each to the other certain duties based upon positive law. The same is true of other family relationships. If one spouse leaves the other because of a publication which in fact is true, the abandoned spouse has no right of action. If one spouse breaks up the family relation because of a publication which is admittedly untrue, no matter how humiliating or objectionable, then that spouse has violated an obligation for a reason which the law cannot recognize.

One publishing a statement which is libelous *per se* assumes the risk of being held in damages if the statement be false, but bears only the risk of being responsible for such damages as reasonably follow from the fact of the publication of false and libelous matter. Suppose a newspaper publishes a libelous statement concerning a young girl who is living with her parents, and the next day publishes a complete retraction, stating that it was a case of mistaken identity, and the daughter's innocence is recognized by her parents. If the parents, notwithstanding the fact that it appears beyond question that their daughter was wholly innocent of wrongdoing, throw her out of their home and refuse to have anything more to do with her, could such unjustifiable and unnatural conduct be considered as part of the basis for an award of damages? I think not, because such conduct would be unreasonable and against all established rules of human conduct, natural, moral or legal.

In an anonymous case reported in 60 N. Y. 262, it appeared that words which the court held were not actionable *per se,* in that they did not constitute an indictable offense, were, under the facts shown, insufficient to support any special damage. It appeared that the plaintiff, a minor, was residing with her father, who, because of the defamatory words uttered,

refused to fulfill certain promises which he had made to his daughter. The father testified that he wholly disbelieved in the truth of the charge. The court said:

"Damage, to sustain the action, must be the natural and immediate consequence of speaking the words. (*Terwilliger v. Wands,* 17 N. Y. 57.) A father is bound by law to support and educate his minor child. The mode and state of the maintenance furnished, and the kind and extent of education given, is necessarily largely left to his discretion. This case it will be seen does not present the question whether a malicious slanderer of the child, who imposes upon the parent a false belief that it is guilty of vicious conduct, and thereby influences the exercise of his discretion less favorable to the child than the parent otherwise would have done, is liable to an action—in other words, whether, by such means, so influencing paternal discretion constitutes special damage to the child. In this case the father testified, in substance, that he believed the charge entirely false and groundless. It is obvious that so far from being natural, it would be highly unnatural for a parent to withhold any favor or kindness from his child on account of a falsehood reported about it. On the contrary, the tendency would naturally and legitimately be to induce more kindness and greater indulgence. Indeed, I do not think special damage can be predicated upon the act of any one who wholly disbelieves the truth of the story. It is inducing acts injurious to the plaintiff, caused by a belief of the truth of the charge made by the defendant, that constitutes the damage which the law redresses."

In the English case of *Lynch v. Knight,* 9 H. L. 577, it was held, on appeal to the House of Lords, that in an action by a wife for slander, the alleged ground of special damage did not show, in the conduct of the husband in leaving the wife, a natural and reasonable consequence of the slander.

So here, it appears that respondent's wife left him after the publication of the retraction. However much

she may have been annoyed and humiliated by the original publication, in so far as it was false, Senora Luna had absolutely no reason for leaving her husband, and if she left him because she objected to any things which he in fact did, and which were brought to her attention by the publication, then certainly respondent cannot recover on that account against appellant.

Assuming that, under certain circumstances, such testimony as this might be admissible, it is certainly of a very dangerous nature, as it would be very easy for one spouse to leave the other until after the trial of an action, when any amount recovered could be enjoyed by a reunited family. In the case at bar, it does not appear that respondent's wife had divorced him, but simply that she had returned to her family in Peru, where at the time of the trial she was still residing.

It seems to me clear that the trial court improperly admitted the testimony hereinabove referred to, and that for this reason a new trial should be granted.

In any event, such testimony should be admitted only under instructions clearly limiting its scope. If the jury believed that, because of the publication, respondent's home had been broken up, and that appellant was liable for this result, clearly any award in respondent's favor would be greatly increased. From the nature of the case, the damages cannot be estimated by any recognized measure, and for this reason the court's instructions as to what the jury may consider in making any award are of great importance. Appellant requested the court to give the following instructions:

"If under these instructions you determine that the article complained of by plaintiff is libelous of plaintiff and that the libelous charges, if any, in said article were not substantially true, then I instruct you

that in your deliberations as to the amount of damage to be awarded by you to plaintiff, if any, you shall wholly disregard the fact that the wife of plaintiff and his children are now living in Peru.

"If under these instructions you determine that the article complained of by plaintiff is libelous of plaintiff and that the libelous charges if any, in said article were not substantially true, then I instruct you that in your deliberations as to the amount of damage, if any, to be awarded by you to plaintiff, you shall wholly disregard any allegation, charge or evidence of plaintiff or statement of counsel which directly or indirectly states, intimates or tends to establish that plaintiff's wife has left him because of the publication of the article complained of by him, or that the publication of said article has caused his home to be broken up or the affection of his wife and family to be alienated;"

and excepted to the refusal of the trial court to so instruct the jury.

If it be considered that the testimony to the effect that the wife had left the home was admissible, then, in my opinion, these instructions should have been given, and the failure to give the same constitutes reversible error. The opinion of the supreme court of California, in the case of *Earl v. Times-Mirror Co.,* 185 Cal. 165, 196 Pac. 57, is cited in the majority opinion as supporting the admissibility of respondent's testimony to the effect that the respondent's wife, after the publication, manifested toward him contempt, hatred and aversion. It should be noted, however, that, in the opinion cited, the court said:

"The plaintiff here did not testify to the effect of the article upon his wife, or of her grief, if any, upon him, but merely as to his own belief as to its effect upon her. That is to say, as to its effect upon his own mind. The case of *Couch v. Mining Journal Co.,* 130 Mich. 294 [89 N. W. 936], is cited to the same effect. In that case the plaintiff sought to prove the

effect upon the members of his family, which was held to be improper, *while in this case the court was careful to instruct the jury that they were not to consider the plaintiff's testimony as evidence of the fact that the wife was affected by the article*. The case of *Sheftall v. Central of Georgia Ry. Co.*, 123 Ga. 589 [51 S. E. 646], is also cited to the same effect. The distinction between these cases and the one at bar may be made manifest by an illustration. Suppose that a man feared that his wife might commit suicide when she read the article in question? This belief, however erroneous it might be, is one which would cause him mental suffering. The wife might commit suicide and neither that fact nor the effect of the suicide upon the husband could be offered in evidence to establish the measure of his damages. On the other hand, the wife might take a very cheerful view of the situation and comfort her husband instead of committing suicide. In either view the plaintiff is entitled to recover for such mental worry as is proximately caused by the article, although not by the mental worry caused by the suicide, for such worry would not be a proximate result of the article." (Italics mine.)

I incline to the view that the testimony which is referred to in this dissent was under no circumstances admissible, but in any event, it should be admitted only under an allegation of special damage. Had the trial court instructed the jury as requested by appellant, it might be held that a case of error without prejudice was presented, but as the jury were permitted to consider the testimony without any such instructions, I am of the opinion that the judgment appealed from should be reversed and a new trial ordered.

TOLMAN, J., concurs with BEALS, J.

HOLCOMB, J. (dissenting)—Although unable to agree entirely with the reasoning of the dissent, I agree with

the result reached by Judge Beals that a new trial should be granted for the error he discussed and others.

