[No. 43702. En Banc. February 11, 1976.]

WILLIAM TASKETT, *Appellant*, v. KING BROADCASTING COMPANY, ET AL, *Respondents*.

 

*Robert H. Stevenson,* for appellant.

*Davis, Wright, Todd, Riese & Jones, Evan L. Schwab,* and *Marshall J. Nelson,* for respondents.

HUNTER, J.—The plaintiff (appellant), William Taskett, appeals from a summary judgment entered by the Superior Court for King County in favor of the defendants (respondents), KING Broadcasting Company and James Harriott, KING's anchorman on the evening news. The plaintiff's action sounds in libel, and this appeal raises the question of whether "actual malice" needs to be established when the statement was directed at a private person, yet pertains to an issue of public concern.

For almost 20 years the plaintiff had been engaged in the advertising business in the Seattle area, owning 95 percent of an agency incorporated under the name Bill Taskett & Associates, Inc. The agency was principally involved in the placement of ads for other businesses and private individuals with the radio and television media.

In December of 1972, the plaintiff's business had suffered serious financial setbacks. He had lost one of his most lucrative accounts, and there were insufficient assets with which to meet his total debts. The threat of lawsuits and pressure from creditors finally took its toll causing the plaintiff to follow the advice of his attorney and file for a statutory dissolution of the corporation. A certified public accountant was appointed as trustee and a notice of dissolution was sent out to all creditors, including the defendant. Feeling in need of rest, the plaintiff and his wife decided to take a short vacation in Mexico. Under the mistaken belief that a prior deposit would be applied by his landlord against his rent owing for his office space in November and

December of 1972, the plaintiff did not make any payments for these 2 months, and he left Seattle without giving any notice. Upon departing, the plaintiff sublet his apartment to a friend. At this time his liabilities exceeded $90,000, while his assets were but a fraction of this amount.

On January 11, 1973, KING television, on its evening newscast, carried a story about the disappearance of the plaintiff. Mike James, a reporter for the defendant, had investigated the story, talking to the individual who was living in the plaintiff's apartment, the trustee, various creditors, and looking at court files which related to suits being brought against the plaintiff. James ascertained that the plaintiff was in Mexico by finding a note in the plaintiff's office with a hotel number on it. Upon calling the hotel, James discovered that the plaintiff had just left. The story was then turned over to John Heffron, the news director at KING, for his final approval. The text of the story is set out in full in the appendix to this opinion. Suffice to say that the plaintiff contends the story depicted him as a "thief and a swindler," which constituted libel per se, since, he contended, it was wholly unfounded in fact.

Upon learning of the story, the plaintiff returned to Seattle, but was unable to gain employment, which ultimately necessitated the moving of his family to California. The plaintiff brought this action against the defendants, who moved for summary judgment relying on this court's decision in *Miller v. Argus Publishing Co.*, 79 Wn.2d 816, 490 P.2d 101 (1971), which required the plaintiff to establish "actual malice" with convincing clarity. Prior to reaching its decision, the recent holding in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974), was brought to the attention of the trial court, which permitted each state to establish its own standard for libel actions brought by private individuals over stories relating to matters of public concern. However, the trial court granted the motion citing the *Miller* decision. Even though the court found that the plaintiff was a private individual and that the story related to a matter of general public

concern, it also stated that any change in the law would have to come from the state Supreme Court. The plaintiff's appeal was certified to this court by the Court of Appeals.

Prior to 1964, the libel laws of the individual states had developed from the common law, free of any First Amendment considerations. However, in *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80, 11 L. Ed. 2d 686, 84 S. Ct. 710, 95 A.L.R.2d 1412 (1964), the United States Supreme Court departed from the common-law approach and enunciated the following test:

> The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice"—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.

In 1967, the court extended its rule to those instances involving *public figures. Curtis Publishing Co. v. Butts*, 388 U.S. 130, 18 L. Ed. 2d 1094, 87 S. Ct. 1975 (1967). In response to these newly announced constitutional considerations, we adopted the above rule, so far as it applied to public officials and public figures, in *Grayson v. Curtis Publishing Co.*, 72 Wn.2d 999, 436 P. 2d 756 (1967). From this point, the United States Supreme Court took the final step and extended the *New York Times* rule to comments which pertained to private individuals, yet dealt with matters of public or general interest. *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 29 L. Ed. 2d 296, 91 S. Ct. 1811 (1971). However, unlike *New York Times* and *Curtis*, *Rosenbloom* was decided by a mere plurality decision. Regardless of the obvious conflicting opinions on our highest court, upon being confronted with the same issue, we accepted what was then considered to be a *constitutionally required rule*, and formally adopted the *Rosenbloom* plurality decision in *Miller v. Argus Publishing Co.*, 79 Wn.2d 816, 490 P.2d 101 (1971).

*New York Times Co. v. Sullivan, supra*, and its progeny,

clearly represents an attempt to reconcile the state's interest in protecting the reputations of its citizens and the constitutional guarantee of a free and vibrant press, the latter being made paramount to the former. *Rosenblatt v. Baer*, 383 U.S. 75, 15 L. Ed. 2d 597, 86 S. Ct. 669 (1966); *Tilton v. Cowles Publishing Co.*, 76 Wn.2d 707, 459 P.2d 8 (1969). However, the court lacked solidarity on this basic issue as witnessed by the fact that each time the *New York Times* rule was extended, dissention increased, ultimately resulting in the *Rosenbloom* plurality. Therefore, it came as little surprise when the court granted certiorari "to reconsider the extent of a publisher's constitutional privilege against liability for defamation of a private citizen." *Gertz v. Robert Welch, Inc., supra* at 325.

In *Gertz*, the plaintiff, a private attorney practicing in Chicago, brought an action against Robert Welch, Inc., for an article published in the defendant's monthly magazine, which characterized him as a "Leninist" and a "Communist-fronter" who was behind a Communist campaign conspiring to discredit law enforcement agencies across the country. The jury awarded the plaintiff $50,000. However, anticipating the *Rosenbloom* decision, the federal district court entered a judgment notwithstanding the verdict applying the *New York Times* standard. This decision was affirmed by the Court of Appeals. *Gertz v. Robert Welch, Inc.*, 471 F.2d 801 (7th Cir. 1972). The United States Supreme Court reevaluated its *Rosenbloom* decision in an attempt to achieve a more realistic accommodation between the states' legitimate interest in protecting private individuals from defamatory falsehoods, and the need for a free press. The court concluded that the *New York Times* rule, while retaining its validity as to public officials and public figures, "inadequately serves both of the competing values at stake" when applied to private citizens, and that the states' interest in providing a remedy to these defamed individuals *required* a different rule where the substance of the statement " 'makes substantial danger to reputation apparent.' " *Gertz v. Robert Welch, Inc., supra* at 346 and

348. The court did not mandate that the states abandon the "actual malice" approach as applied to private individuals, but rather, on page 347, held that

> so long as they do not impose liability without fault, *the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual.*

(Italics ours.) We agree that the "actual malice" standard, when applied to private individuals, imposes a totally unacceptable burden, and therefore a change is required.

The basic policy underlying the *New York Times standard* was the need to perpetuate an uninhibited *"marketplace of ideas,"* by providing a near absolute constitutional protection to the press. However, this *marketplace* approach fails to recognize that "there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues." *Gertz v. Robert Welch, Inc., supra* at 340; *Tilton v. Cowles Publishing Co., supra.* Furthermore, prior to the advent of *New York Times Co. v. Sullivan, supra,* this state had consistently held that "[m]alice is not a necessary element of civil libel, and is immaterial upon the issue of whether published words are defamatory." *Purvis v. Bremer's, Inc.,* 54 Wn.2d 743, 755, 344 P.2d 705 (1959). *See also Pitts v. Spokane Chronicle Co.,* 63 Wn.2d 763, 388 P.2d 976, 9 A.L.R.3d 550 (1964); *Luna de la Peunte v. Seattle Times Co.,* 186 Wash. 618, 59 P.2d 753, 105 A.L.R. 932 (1936); *Wilson v. Sun Publishing Co.,* 85 Wash. 503, 148 P. 774 (1915). Moreover, the only defenses available were "truth, consent, absolute privilege, qualified or conditional privilege, and fair comment . . ." *Jolly v. Fossum,* 63 Wn.2d 537, 541, 388 P.2d 139 (1964). It was not until *New York Times Co. v. Sullivan, supra,* that we retracted from this firmly established policy of allowing a citizen open access to the courts in order to seek damages from those who published false and defamatory statements. Thus, it is totally consistent with our prior decisions to now return to a more fair and

equitable standard to be applied to this classification of plaintiffs. Therefore, we hold that *a private individual, who is neither a public figure nor official, may recover actual damages for a defamatory falsehood, concerning a subject of general or public interest, where the substance makes substantial dangers to reputation apparent, on a showing that in publishing the statement, the defendant knew or, in the exercise of reasonable care, should have known that the statement was false, or would create a false impression in some material respect.*

The reason for distinguishing private individuals from public officials and figures is twofold. First, both public officials and public figures have greater access to the various "channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 344, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974); *Curtis Publishing Co. v. Butts, supra; Rosenbloom v. Metromedia, Inc., supra; Tilton v. Cowles Publishing Co., supra* at 729 (dissenting opinion by Justice Rosellini). However, even if this form of self-help was freely available to all classifications of plaintiffs, years of experience have firmly established the basic fact that " 'the truth never catches up with the lie.' " *Tilton v. Cowles Publishing Co., supra* at 714. Second, in formulating the proper standard to be applied, a more important consideration is the basic distinction between the nature of the state's interest in protecting private individuals as opposed to public individuals in defamation cases. *Gertz v. Robert Welch, Inc., supra* at 344. The state's interest in protecting a public official is far outweighed by the countervailing need of the public to be informed as to anything which bears on that individual's fitness for office. By seeking public office, this person willingly exposes his life to public scrutiny. Those classified as public figures stand in a similar position, since this category is the result of the individual having assumed one of two roles. As noted in *Gertz* at page 351:

In some instances an individual may achieve such perva-

sive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. *In either case such persons assume special prominence in the resolution of public questions.*

(Italics ours.) Therefore, with regard to public officials and public figures, the First Amendment compels a greater tolerance since they have, through their conduct, intentionally placed themselves before the public with full knowledge of the attention accorded individuals in their position by the media, and the public's need to be fully informed is at its maximum. However, a private individual has not, through his conduct, invited either the increased scrutinization nor the risk of being defamed through a careless error. Since he has not relinquished any of his interest in protecting his reputation

> he has a more compelling call on the courts for redress of injury inflicted by defamatory falsehood. Thus, private individuals are not only more vulnerable to injury than public officials and public figures; they are also more deserving of recovery.

*Gertz v. Robert Welch, Inc., supra* at 345.

It has been argued by the defense that to reduce the standard first enunciated in *New York Times*, and subsequently adopted in both *Rosenbloom* and *Miller*, will have a "chilling effect" upon the press and, therefore, result in self-censorship. We find this contention to be without merit. It is true that greater caution must now be exercised where the subject of a publication is a private person, yet such a rule is totally justifiable in light of the state's overriding interest in providing a realistic remedy to an otherwise helpless private citizen. It cannot be gainsaid that any social value derived through a defamatory falsehood pertaining to a truly private individual is "clearly outweighed by the social interest in order and morality." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 86 L. Ed. 1031, 62 S. Ct. 766 (1942). Furthermore, since erroneous statements of fact

are inevitable, this newly announced standard does not require the media to guarantee the absolute accuracy of their publications, as would be required under a strict liability scheme. However, just as the First Amendment will not tolerate a strict liability criteria, neither will this State's strong policy, providing a means of compensation to private citizens for injuries to their reputations, tolerate the giving of a near-absolute immunity to the media. Thus, these two competing values must be tempered so that neither social requisite be destroyed. We believe the standard we have adopted today will achieve this necessary balance.

■ Finally, the element most likely to give rise to self-censorship is the uncontrolled discretion of juries to award damages which reflect their disdain for the publishing of an unpopular opinion, rather than a realistic level of compensation for the actual injury sustained. Therefore, as stated in *Gertz*, juries shall be limited to awarding damages for only *actual* injuries sustained, and shall not be allowed to *presume* the existence of any damages in the absence of a finding that the statement was published with knowledge that it was false or with a reckless disregard for the truth. While damages may be *presumed* upon a finding of "actual malice," under *no circumstances* will we allow a jury to award *punitive* damages. Herein lies the true protection afforded by the First Amendment, for, as Mr. Justice Blackmun noted in his concurring opinion in *Gertz* at page 354:

> By removing the specters of presumed and punitive damages in the absence of *New York Times* malice, the Court eliminates significant and powerful motives for self-censorship that otherwise are present in the traditional libel action.

We therefore hold that a private individual need no longer establish "actual malice" in order to recover actual damages resulting from publication of a defamatory falsehood, and insofar as *Miller v. Argus Publishing Co.*, 79 Wn.2d 816, 490 P.2d 101 (1971), is inconsistent with this opinion, it is hereby overruled.

■■ A subsidiary issue is whether the rule we announce today shall be applied retroactively or prospectively. While this question most frequently arises in the areas of criminal process, constitutional rights, and statutory interpretation, it is by no means limited to these fields. In *Chevron Oil Co. v. Huson*, 404 U.S. 97, 106, 30 L. Ed. 2d 296, 92 S. Ct. 349 (1971), the United States Supreme Court set forth the following three factors to serve as the proper test for determining retroactivity in civil suits:

> First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied . . . or by deciding an issue of first impression whose resolution was not clearly foreshadowed . . . Second, it has been stressed that "we must . . . weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." . . . Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity."

(Citations omitted.) Applying these factors to the instant case, we hold that retroactive application is warranted.

The utilization of a lesser standard than actual malice is certainly not a novel principle of law. As noted earlier, the test which we have adopted merely represents a return to our pre-*New York Times* rule, insofar as *Gertz* permits. Furthermore, we question whether the plurality decision in *Rosenbloom* was in fact relied upon by the media to the degree argued by the defendants. It was the first libel decision since *New York Times Co. v. Sullivan*, 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710, 95 A.L.R.2d 1412 (1964), which failed to receive the approval of a majority of the court. Therefore, it should have been evident that *Rosenbloom* did not represent the final word as to the propriety of applying an actual malice standard to private individuals. In fact, *Gertz* was the first libel case to be heard by the United

States Supreme Court subsequent to *Rosenbloom*. The rule adopted by the plurality opinion in *Rosenbloom* does not constitute a clear precedent of long standing, as contemplated in the above rule, and therefore does not compel a prospective application in the instant case.

The purpose of adopting a negligence criteria is to reassert our legitimate state interest in providing a realistic remedy for private individuals actually injured by a defamatory falsehood. As heretofore stated, it was only as a result of *New York Times Co. v. Sullivan, supra*, and its progeny, that we varied from our long line of cases providing such a remedy to all classes of defamed individuals. Only through retroactive application can the rule enunciated in this opinion fully effectuate the purpose intended by *Gertz* and this court. The significance of this factor cannot be underestimated, for while reliance was once considered to be the controlling criteria, recent decisions demonstrate that it has been replaced by the *purpose* and *effect* of the civil rule.[1] Wilson, *Retroactivity in Civil Suits: Linkletter Modified*, 42 Fordham L. Rev. 660 (1974). *See also Chevron Oil Co. v. Huson, supra*; *Williams v. United States*, 401 U.S. 646, 28 L. Ed. 2d 388, 91 S. Ct. 1148 (1970). Furthermore, absent unique circumstances, we have consistently applied our decisions retroactively whenever the intended purpose was to provide a remedy for an individual who has been tortiously injured and now seeks redress before this court. *See, e.g., Memel v. Reimer*, 85 Wn.2d 685, 538 P.2d 517 (1975); *Freehe v. Freehe*, 81 Wn.2d 183, 500 P.2d 771 (1972); *cf. Godfrey v. State*, 84 Wn.2d 959, 530 P.2d 630 (1975); *Blaak v. Davidson*, 84 Wn.2d 882, 529 P.2d 1048 (1975).

The final consideration is whether there are sufficient inequities resulting from a retroactive application as to limit the decision to prospective effect only, in spite of

[1] An exception to the above statement is in the area of contractual relations where the rights of the parties have actually vested. *See Lemon v. Kurtzman*, 411 U.S. 192, 36 L. Ed. 2d 151, 93 S. Ct. 1463 (1973).

what the prior factors support. We fail to see how applying this decision retroactively will produce an inequitable result of overriding magnitude. In fact, equity would seem to compel the opposite result, since it is of little solace to an individual who seeks legal redress upon being seriously defamed to be informed that as a result of his efforts, future plaintiffs will no longer be deprived of a remedy due to their inability to establish "actual malice" with convincing clarity, but, as to him, no relief is available. Who better deserves the benefits of an equitable result; the individual whose reputation has been utterly destroyed, or the media who has abused its power and breached its ethical duty to present the general public with the truth in an unbiased and impartial manner? A realistic view of the rights and power of the respective parties surely favors the former. Furthermore, it is most significant that every decision of the United States Supreme Court and this court, from *New York Times Co. v. Sullivan, supra,* through *Gertz v. Robert Welch, Inc., supra,* has been applied retroactively. We find no justifiable reason for departing from this approach in the instant case.

The defendants argue that in any event the broadcast under the facts of this case was substantially true and that the trial court's decision should therefore be upheld. We find this contention to be premature in view of our announced rule, as the facts must be considered by the trial court under summary judgment, or by the jury if summary judgment be denied, in the light of the rule we have now enunciated.

Therefore, the decision of the trial court is reversed and this cause is remanded for further proceedings consistent with this opinion.

ROSELLINI, HAMILTON, WRIGHT, and BRACHTENBACH, JJ., concur.

APPENDIX

KING NEWS SERVICE
TASKETT STORY—1/11/73
Mike James, Reporter

| | |
|---|---|
| HARRIOTT: | Several Seattle businesses, including some television and radio stations, are looking for an advertising man. He's gone and he may have some of their money. Here's Mike James. |
| A/ROLL FILM. . . ./ | A lot of people are looking for Bill Tas-'kett . . . and no one knows where he is. |
| | He's not at the offices of Taskett and Associates . . . an advertising agency on Fairview East. The landlord there says Taskett left without notice—and owed some rent. |
| | Taskett's not in his apartment. Another man is there. And he says Taskett will be gone six months or more. |
| REPORTER AT COURTHOUSE: | We did find something on Bill Taskett in the Clerk's Office of the King County Courthouse. Allied Stores, which includes the Bon Marche, has filed an action against him, seeking to recover 32 thousand dollars. Allied alleges that Taskett was given the money to pay for advertising on Seattle radio and television. They say he took the money fraudulently for his own use. |
| | So the Bon is out 32 thousand dollars . . . and that's just the beginning. |
| A/ROLL FILM. . . ./ | Other advertisers . . . including this car dealer . . . gave Taskett money to pay for advertising on radio and television. |
| | Sources in the industry say the total given is in excess of 60 thousand dollars. |
| | But the stations never got the money. One network affiliate is said to be out nearly 20 thousand dollars. |
| | And there's not much chance of recovering the money. Before he disappeared, Taskett |

put his agency into receivership. The receiver says debts may total 100 thousand dollars . . . while assets include a few pieces of office furniture . . . worth a fraction of the debt.

REPORTER ON EASTLAKE: We can't say what happened to the money Taskett was paid by his clients . . . but we can help with the question: Where is he?

This is a copy of a letter sent by Taskett asking for a hotel room in Puerto Vallarta, Mexico. We called the hotel. Taskett was there, but he checked out yesterday. No one knows where he is now.

There is some irony in this whole story. We are told by Taskett's clients that he went through bankruptcy proceedings a few years ago. Yet they still advanced him money. We asked them why. And they said, "That's a good question."

This is Mike James for KING News Service.

HARRIOTT: Bill Taskett, won't you please come home.

STAFFORD, C.J. (concurring in part; dissenting in part)—I concur with the majority's holding that "a private individual . . . may recover actual damages for a defamatory falsehood, concerning a subject of general or public interest, where the substance makes substantial dangers to reputation apparent, on a showing that in publishing the statement, the defendant knew or, in the exercise of reasonable care, should have known that the statement was false, or would create a false impression in some material respect." (Italics omitted.)

I also concur with the opinion insofar, but only insofar, as the holding appears to apply retroactively to the *instant* case. Generally, a party should be entitled to the fruits of his own lawsuit.

In this limited sense it is well settled in Washington that unless the decision changing an existing rule holds otherwise, the change made in the opinion is retroactively ap-

plied to the case in which the change is adopted. This view is illustrated by the following cases overruling prior *decisional rules of law*. *Memel v. Reimer*, 85 Wn.2d 685, 538 P.2d 517 (1975); *Blaak v. Davidson*, 84 Wn.2d 882, 529 P.2d 1048 (1975); *Lyons v. Redding Constr. Co.*, 83 Wn.2d 86, 515 P.2d 821 (1973); *Freehe v. Freehe*, 81 Wn.2d 183, 500 P.2d 771 (1972); *Friend v. Cove Methodist Church, Inc.*, 65 Wn.2d 174, 396 P.2d 546 (1964); *Potts v. Amis*, 62 Wn.2d 777, 384 P.2d 825 (1963); *Siragusa v. Swedish Hosp.*, 60 Wn.2d 310, 373 P.2d 767 (1962); *State ex rel. Chelan Elec. Co. v. Superior Court*, 142 Wash. 270, 253 P. 115, 58 A.L.R. 779 (1927); *Christianson v. Fayette R. Plumb, Inc.*, 7 Wn. App. 309, 499 P.2d 72 (1972). In none of these cases, however, does the court mention the issue of retroactivity, either as it applies to the case decided or to similar prior cases.

Therefore, I am compelled to disagree with the majority's apparent unlimited or general retroactive application of the rule of this case to *all* similar cases. Although respondents urged, as a defensive or "fall back" position in their brief, that any decision overruling *Miller v. Argus Publishing Co.*, 79 Wn.2d 816, 490 P.2d 101 (1971) should be applied prospectively only, the issue of retroactivity was neither raised by the parties nor was it decided by the court below. Thus, the majority's determination is not only premature but wholly unnecessary to a resolution of the issues before us.

The usual practice of withholding determination as to the retroactive effect of a new decisional rule is supported by legal scholars who point out that the question of retroactivity should *not* be decided until a court has been presented with an actual case or controversy calling for

the discretionary decision of whether a court, having announced a new rule, should join to that announcement a statement on whether or not the new rule will be retroactively applied. *Thus, the decision of whether to make an announcement with respect to retroactivity becomes, in these circumstances, almost precisely a decision as to whether the issue of retroactivity has been presented to*

*the court as—and not merely in association with—an
actual case or controversy.* In wide measure the same
reasons—recited above—which at once justify and limit
the court in hearing a question in the first place also
justify and limit it in hearing the companion question of
retroactivity.

. . . A court's use of deliberate silence about the
retroactive effect of a judicial decision should be re-
garded as another technique of declining jurisdiction in
the cause of institutional competence; in short—a passive
virtue.

(Italics mine.) *Prospective Overruling and Retroactive Ap-
plication in the Federal Courts,* 71 Yale L.J. 908, 935-36
(1962).

It is generally recognized that the question of the extent
to which retroactive operation of an overruling decision
should apply is a difficult one dependent on the nature of
the particular overruling decision involved. It should not be
answered as to particular situations unless parties in those
situations are actually before the court. Otherwise, the ex-
tent of the retroactive effect of an overruling decision with
respect to nonparties will merely constitute inappropriate
dictum impinging upon such important factors as res judi-
cata, vested rights, *reliance,* and the effect of retroactive
application on administration of justice, to name only a
few. Further, the question should not be answered until
courts and legal scholars have had ample time to weigh the
various ramifications as to the extent of retroactive opera-
tion. As stated in *Prospective or Retroactive Operation of
Overruling Decision,* Annot., 10 A.L.R.3d 1371, 1381 (1966):

[E]ven if the court expressly or implicitly recognizes
that sufficient reasons for granting retroactive effect to
the overruling decision are present in the overruling case
itself, the court should nevertheless leave open the possi-
bility that the denial of retroactive effect may or may not
be appropriate in particular cases other than the overrul-
ing case . . .

Turning from the general to the particular treatment of
cases in our own state, my research discloses that this court
has not previously discussed the unlimited or general retro-

active application of a particular case *overruling a decisional rule of law*. From this, it is logical to assume that heretofore the members of this court have felt it was more prudent to deal with the issue of unlimited or general retroactivity of opinions overruling *decisional rules of law* only when it arises in subsequent cases. Yet, the majority insists upon dealing with the issue at this time. The Washington cases cited by the majority to support the unlimited general retroactive overruling of a *decisional rule of law* do *not* support its position.[2] In fact, the cases are not in point. If applicable at all, they support only the rule that the change made in an opinion is retroactively applicable to the *case* in which the change is adopted (*Memel v. Reimer, supra, Freehe v. Freehe, supra,* and *Blaak v. Davidson, supra*); or, that a *statute* enacted by the legislature is deemed to have retroactive application if such legislative intent is found (*Godfrey v. State,* 84 Wn.2d 959, 530 P.2d 630 (1975)).

The majority also has cited *Chevron Oil Co. v. Huson,* 404 U.S. 97, 30 L. Ed. 2d 296, 92 S. Ct. 349 (1971) as establishing the factors necessary to determine the issue of retroactivity in the present case. But, *Chevron* is as wide of the mark as the Washington State cases cited. First, *Chevron* involved a *statute, not* a decisional rule of law, as in the instant case. *Second,* in *Chevron* the United States Supreme Court applied the newly developing doctrine of *prospective* overruling[3] and held that the newly adopted rule would not be applied retroactively in the case decided. Finally, even assuming the applicability of *Chevron* despite the foregoing disparities, the majority has failed to follow the basic factor used by the *Chevron* court in applying its decision *prospectively, i.e.,* it has ignored *Chevron's* use of

---

[2]*Memel v. Reimer,* 85 Wn.2d 685, 538 P.2d 517 (1975); *Freehe v. Freehe,* 81 Wn.2d 183, 500 P.2d 771 (1972); *Blaak v. Davidson,* 84 Wn.2d 882, 529 P.2d 1048 (1975); *Godfrey v. State,* 84 Wn.2d 959, 530 P.2d 630 (1975).

[3]For a discussion of the doctrine of prospective overruling, *see State ex rel. State Fin. Comm'n v. Martin,* 62 Wn.2d 645, 663, 384 P.2d 833 (1963).

the "new principle of law" or "reliance of the parties" criterion, which is the main factor used in civil cases. 10 A.L.R.3d 1371 (1966). Rather, the majority relies mainly on the "purpose of the rule" factor found in *Williams v. United States*, 401 U.S. 646, 28 L. Ed. 2d 388, 91 S. Ct. 1148 (1970).

*Williams*, however, is a *criminal* case and obviously inapposite. Further the law review note cited by the majority for support (Wilson, *Retroactivity in Civil Suits: Linkletter Modified*, 42 Fordham L. Rev. 653 (1974)), comments on the fact that the "purpose of the rule" factor (relied on by the majority in this civil action) is the general criterion used for the application of retroactivity in *criminal* cases. This note also indicates, at pages 653-54, that although the "purpose of the rule" factor has been used in a few federal *civil* cases, those cases were generally concerned with *conditional challenges to in-prison disciplinary rules determined under due process procedures, i.e.,* criminal overtones were involved. In addition, it is important to observe, at page 659, that *courts in civil cases focus on the "reliance factor,"* the factor clearly rejected by the majority.

It is clear that insofar as the *unlimited or general retroactivity of opinions overruling decisional rules of law* is concerned, the opinion of the majority stands uniquely by itself, unsupported by even the cases upon which it relies. In the area of retroactivity this court should look primarily at the "reliance" or "new principle of law" factor in civil cases, as is done by other legal authorities and the applicable case law. Retroactivity should not be applied in a general unlimited manner as done here, but rather, only when the issue comes before the court as an actual case or controversy.

FINLEY, J. (concurring in part; dissenting in part)—I concur in the result which Stafford, C.J., would reach, namely, that except for the litigants, the majority decision *should apply prospectively only.*

HOROWITZ, J. (dissenting)—The majority opinion over-

rules *Miller v. Argus Publishing Co.*, 79 Wn.2d 816, 490 P.2d 101 (1971). Its action in doing so is permitted but not required by *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974). In the case of a defamatory statement relating to a private person's involvement in an event of public or general interest, the majority overrules *Miller* as a policy matter so that proof of negligence may be substituted for the requirement of proof of malice, as that term is used in *New York Times Co. v. Sullivan*, 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710, 95 A.L.R.2d 1412 (1964), and its progeny, including *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 29 L. Ed. 2d 296, 91 S. Ct. 1811 (1971).

The majority opinion in effect embraces a policy that substantially increases the risk of self-censorship by publishers and broadcasters—a risk sought to be avoided by *Times* and *Rosenbloom* followed in *Miller*—and substantially increases the complexities in the law of defamation, which will take a new generation of cases to clarify. The fact that since *Gertz* the appellate courts of three states have rejected the negligence test in favor of retaining the malice test, emphasizes the necessity of carefully examining the validity of the majority's policy arguments advanced to support the adoption of the new negligence test. These cases, as in the instant case, involve liability for defamatory statements relating to a private person's involvement in an event of public or general interest. *Walker v. Colorado Springs Sun, Inc.*, ‒‒‒‒‒ Colo. ‒‒‒‒‒, 538 P.2d 450 (1975); *AAFCO Heating & Air Conditioning Co. v. Northwest Publications, Inc.*, ‒‒‒‒‒ Ind. App. ‒‒‒‒‒, 321 N.E.2d 580 (1974); *Commercial Programming, Unlimited v. Columbia Broadcasting Sys., Inc.*, 81 Misc. 2d 678, 367 N.Y.S.2d 986 (Sup. Ct. 1975).

## THE COMMON LAW OF DEFAMATION

At common law, liability for defamation, oral or written, was a strict liability. In broad outline the tort of defama-

tion occurred, with resulting liability for damages, when (1) the statement was false, (2) the statement was defamatory of the plaintiff, and (3) the statement was communicated, *i.e.*, published through someone other than the person defamed. Even if defamation occurred as a result of the concurrence of the three elements of the tort, the plaintiff might still be without remedy. The defendant could claim two types of defenses: truth or privilege. The defendant had the burden of proving the truth of the defamatory statement and, if proved, the defendant had a complete defense. Privileges were of two kinds, absolute and conditional, *i.e.*, defeasible. There were four absolute privileges: (1) for legislators during debate, (2) for persons involved in legal proceedings, (3) for persons in executive government offices making authorized communications in the performance of their duties, and (4) when plaintiff consented to the defamation.

Conditional privileges were of six kinds: (1) publication to advance a legitimate interest of the publisher, recipient or other third person, (2) discussion by a group having a lawful mutual interest for the advancement of that interest, (3) publication to proper persons if in the public interest, (4) publication and exercise of an individual's right to verbal self-defense, (5) reports of proceedings of public interest if the report was accurate, and (6) "fair comment" upon facts relating to public figures and public issues, provided those facts were either true or also subject to a privilege.

Conditional privileges were distinguished from absolute privileges in that they were available only if defendant had the proper intent. If plaintiff showed the remarks were maliciously published out of ill will for the plaintiff, this would defeat a conditional privilege. Particular conditional privileges might also be lost if they were abused in other ways, such as by disbelief by the defendant in his own opinions (fair comment), excessive vehemence in the defamation, or unnecessary communication of the remarks to a person who had no legitimate interest in them.

At common law, damages recoverable in Washington were classified as either general or special. The malice or good faith of the defendant was irrelevant to the damage recovery. If the remark was a defamation per se, *i.e.*, defamatory on its face, general damages were recoverable without proof of injury. General damages were those the law presumed to be the natural and probable consequence of the defendant's conduct. They were of three kinds: (1) for injury to plaintiff's reputation, (2) for the falling off of his business or patronage, and (3) for wounded feelings and humiliation. Special compensatory damages might also be recovered if alleged in the pleadings and proved by the evidence. If the defamation was not defamatory per se, special damages only were recoverable. Exemplary damages were not recoverable in Washington. *See generally* Comment, *An Outline of the Law of Libel in Washington*, 30 Wash. L. Rev. 36 (1955); *Gertz v. Robert Welch, Inc.*, *supra* at 369-75 (White, J., dissenting); Restatement of Torts §§ 558-81 (1938); 1 F. Harper & F. James, *Law of Torts* ch. 5 (1956); W. Prosser, *Handbook of the Law of Torts* ch. 19 (4th ed. 1971).

## The Effect Of The First Amendment As Requiring A Modification Of The Common Law Of Defamation

If the overriding necessity of protecting the First Amendment against the inhibiting effect of the law of defamation is to be properly understood, it is highly desirable that careful attention be paid to what is said in *New York Times Co. v. Sullivan*, *supra*, and certain cases following and expanding the rule of *Times*. Such careful attention is all the more desirable because *Gertz* does not disavow *Times*' strong support of the First Amendment rationale by which it curtailed the otherwise existing remedy for defamation under state law. *Times*, at page 256, posed the question involved as "the extent to which the constitutional protections for speech and press limit a State's power to award damages in a libel action brought by a public official

against critics of his official conduct." The court concluded, at pages 279-80:

> The constitutional guarantees require . . . a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice"—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.

In the later case of *St. Amant v. Thompson*, 390 U.S. 727, 732, 20 L. Ed. 2d 262, 88 S. Ct. 1323 (1968), the court further explained the meaning of malice:

> Nor will [professions of good faith] be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

The *Times* court proceeded on the premise that "freedom of expression upon public questions is secured by the First Amendment," and that libel as a formula "for the repression of expression" is therefore not immune from the First Amendment, but must be measured by its standards. *New York Times Co. v. Sullivan, supra* at 269. The First Amendment, of course, is a restriction on the states through the Fourteenth Amendment. *Gitlow v. New York*, 268 U.S. 652, 666, 69 L. Ed. 1138, 45 S. Ct. 625 (1925). The *Times* court, at page 270, quoted the remarks of Justice Brandeis in *Whitney v. California*, 274 U.S. 357, 375-76, 71 L. Ed. 1095, 47 S. Ct. 641 (1926), that: " 'Those who won our independence believed . . . that public discussion is a political duty . . .' " The court emphasized the *Times* case would have to be considered against the background of "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan, supra* at 270. Other commentators have noted that a prime purpose of

the First Amendment was to protect newspapers against government censorship. *New York Times Co. v. United States*, 403 U.S. 713, 715-17, 29 L. Ed. 2d 822, 91 S. Ct. 2140 (1971) (Black, J., concurring); 1 B. Schwartz, *A Commentary on the Constitution of the United States—Part III, Rights of the Person* 262-63 (1968); 28 Sw. L.J. 1038, 1043 (1975). The court further pointed out that falsity of ideas and beliefs did not create an exception to the First Amendment. The court said: "Authoritative interpretations of the First Amendment guarantees have consistently refused to recognize an exception for any test of truth . . ." The reason is that: "[E]rroneous statement is inevitable in free debate, and . . . must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive.'" *New York Times Co. v. Sullivan, supra* at 271-72, quoting *NAACP v. Button*, 371 U.S. 415, 433, 9 L. Ed. 2d 405, 83 S. Ct. 328 (1963). Accordingly, the court held that a defense of truth would not suffice to remove the publication from the First Amendment's protection, the *Times* court stating at page 279:

A rule compelling the critic of official conduct to guarantee the truth of all his factual assertions—and to do so on pain of libel judgments virtually unlimited in amount—leads to a comparable "self-censorship."

The court pointed out that the self-censorship effect of the common-law libel rule would deter more than false speech because of doubt whether the criticism can be proved in court, or fear of the expense of having to do so. The *Times* court said at page 279:

The rule thus dampens the vigor and limits the variety of public debate. It is inconsistent with the First and Fourteenth Amendments.

The court approved some strong language from a District of Columbia Circuit Court's opinion in which a congressman's libel suit against a newspaper charging him with anti-Semitism in opposing a judicial appointment was dismissed. The *Times* court said at page 272, quoting *Sweeney v. Patterson*, 128 F.2d 457, 458 (D.C. Cir. 1942):

"The interest of the public here outweighs the interest of appellant or any other individual. . . . Whatever is added to the field of libel is taken from the field of free debate."

The second element of common-law libel, that the publication may have been defamatory as well as false, was also not enough to remove the protection of the First Amendment. The *Times* court said at pages 272-73:

Injury to official reputation affords no more warrant for repressing speech that would otherwise be free than does factual error. . . . Criticism of . . . official conduct does not lose its constitutional protection merely because it is effective criticism and hence diminishes their [elective city officials'] official reputations.

Finally, the court held that even if both elements of common-law libel combined in the same remark, that fact is likewise inadequate "to remove the constitutional shield from criticism of official conduct . . ." *New York Times Co. v. Sullivan, supra* at 273.

The court then emphasized the inhibiting effect of damage awards in civil suits upon the exercise of First Amendment freedoms. The inhibiting effect comes from three sources: (1) the possibility of being punished for criticism of public officials without the criminal law safeguards of the requirements of indictment and proof beyond a reasonable doubt; (2) a large judgment award without proof of actual pecuniary loss; and (3) the possibility of other judgments being awarded for the same publication. *New York Times Co. v. Sullivan, supra* at 277-78. The *Times* court said at page 278:

Whether or not a newspaper can survive a succession of such judgments, the pall of fear and timidity imposed upon those who would give voice to public criticism is an atmosphere in which the First Amendment freedoms cannot survive.

Professor Kalven, in his article *The New York Times Case: A Note on "The Central Meaning of the First Amendment,"* 1964 Sup. Ct. Rev. 191, 220, suggested that a negli-

gence standard would not protect the constitutional freedoms in question. He said:

[T]he Court's concern has been with the kind of inevitable factual error and exaggeration that are not extraordinary accompaniments of robust criticism. It is willing to forgive this kind of error. Its affirmative policy need not extend to deliberate falsehoods.

The *Times* test, announced in the context of the public official, was expanded to apply to the public figure who was not a public official. *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 18 L. Ed. 2d 1094, 87 S. Ct. 1975 (1967). Then came *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 29 L. Ed. 2d 296, 91 S. Ct. 1811 (1971). *Rosenbloom* held at page 52:

[A] libel action, as here, by a private individual against a licensed radio station for a defamatory falsehood in a newscast relating to his involvement in an event of public or general concern may be sustained only upon clear and convincing proof that the defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether it was false or not. Calculated falsehood, of course, falls outside "the fruitful exercise of the right of free speech." *Garrison* v. *Louisiana*, 379 U. S. 64, 75 (1964).

(Footnote omitted.) In arriving at this result, the court emphasized the importance of robust discussion on matters of general public concern. The court pointed out also that many public issues exist in which persons other than a public official or a public person are involved. The mere fact that a private individual is involved does not destroy the necessity for protecting the First Amendment right to free press and free speech. Justice Brennan, the author of the majority opinion in *Times* and of the plurality opinion in *Rosenbloom*, said in *Rosenbloom*:

Moreover, the constitutional protection was not intended to be limited to matters bearing broadly on issues of responsible government. "[T]he Founders . . . felt that a free press would advance 'truth, science, morality, and arts in general' as well as responsible government." *Id.*, at 147 [*Curtis Publishing Co. v. Butts, supra*] (opinion of HARLAN, J.). Comments in other cases reiterate

this judgment that the First Amendment extends to myriad matters of public interest. In *Time, Inc.* v. *Hill*, [385 U.S. 374, 17 L. Ed. 2d 456, 87 S. Ct. 534 (1967)], we had "no doubt that the . . . opening of a new play linked to an actual incident, is a matter of public interest," 385 U. S., at 388, which was entitled to constitutional protection. *Butts* held that an alleged "fix" of a college football game was a public issue. *Associated Press* v. *Walker*, 388 U. S. 130 (1967), a companion case to *Butts*, established that the public had a similar interest in the events and personalities involved in federal efforts to enforce a court decree ordering the enrollment of a Negro student in the University of Mississippi.

*Rosenbloom v. Metromedia, Inc., supra* at 42.

Self-governance in the United States pre-supposes far more than knowledge and debate about the strictly official activities of various levels of government. The commitment of the country to the institution of private property, protected by the Due Process and Just Compensation Clauses in the Constitution, places in private hands vast areas of economic and social power that vitally affect the nature and quality of life in the Nation. Our efforts to live and work together in a free society not completely dominated by governmental regulation necessarily encompass far more than politics in a narrow sense.

*Rosenbloom v. Metromedia, Inc., supra* at 41.

We are aware that the press has, on occasion, grossly abused the freedom it is given by the Constitution. All must deplore such excesses. In an ideal world, the responsibility of the press would match the freedom and public trust given it. But from the earliest days of our history, this free society, dependent as it is for its survival upon a vigorous free press, has tolerated some abuse. In 1799, James Madison made the point in quoting (and adopting) John Marshall's answer to Talleyrand's complaints about American newspapers, American State Papers, 2 Foreign Relations 196 (U. S. Cong. 1832):

" 'Among those principles deemed sacred in America, among those sacred rights considered as forming the bulwark of their liberty, which the Government contemplates with awful reverence and would approach only with the most cautious circumspection, there is no

one of which the importance is more deeply impressed on the public mind than the liberty of the press. That this *liberty* is often carried to excess; that it has sometimes degenerated into *licentiousness,* is seen and lamented, *but the remedy has not yet been discovered. Perhaps it is an evil inseparable from the good with which it is allied; perhaps it is a shoot which cannot be stripped from the stalk without wounding vitally the plant from which it is torn. However desirable those measures might be which might correct without enslaving the press, they have never yet been devised in America.' "* 6 Writings of James Madison, 1790-1802, p. 336 (G. Hunt ed. 1906) (emphasis in original).

*Rosenbloom v. Metromedia, Inc., supra* at 51.

The *New York Times* standard was applied to libel of a public official or public figure to give effect to the Amendment's function to encourage ventilation of public issues, not because the public official has any less interest in protecting his reputation than an individual in private life.

*Rosenbloom v. Metromedia, Inc., supra* at 46.

The Supreme Court of Washington had earlier adopted the constitutional limitation upon recovery for defamation of the public official and public person. *Grayson v. Curtis Publishing Co.,* 72 Wn.2d 999, 436 P.2d 756 (1967). *Miller v. Argus Publishing Co.,* 79 Wn.2d 816, 490 P.2d 101 (1971), adopted the rationale of the plurality opinion in *Rosenbloom.*

Then came *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974). In *Gertz,* attorney Elmer Gertz sued Robert Welch, Inc., for alleged libels published in its magazine, *American Opinion.* Although the jury found the remarks defamatory and untrue, the federal district court entered judgment for respondent Welch. The court held that Gertz, although not a public figure or public official, was involved in a trial which was an event of "public or general interest" and, therefore, was required to show that respondent had published the libel with the "reckless disregard" required by the *New York Times* and *Rosenbloom* rules. The Supreme Court of the United States

reexamined and declined to reaffirm the mandatory extension of the *New York Times* standard made in *Rosenbloom*, which had held that at least reckless disregard for the truth by the defendant publisher was necessary for recovery for defamation, even when the plaintiff was not a public official or public figure but was involved in an event of "public or general interest." However, rather than substituting a new standard of its own creation to replace *Rosenbloom*'s, the court held that because of each state's legitimate interest in compensating private individuals who have been defamed, each state should undertake to design its own standard within certain limits.

> [S]o long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual.

*Gertz v. Robert Welch, Inc.*, *supra* at 347. The court required, however, that no such state standard for defamation of private persons adopt the common-law's liability without fault. This limitation was imposed to shield "the press and broadcast media from the rigors of strict liability for defamation." *Gertz v. Robert Welch, Inc.*, *supra* at 348.

The *Gertz* court also added a second limitation upon any new state standards at page 349:

> States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth.

Thus, in *Gertz* at page 350, only damages "sufficient to compensate . . . for actual injury" are permitted, unless the plaintiff establishes a liability under the standards of *New York Times*. The court's reasons for the second restriction were twofold: First, the common-law's "presumed" damages as well as punitive damages unnecessarily increase the possibility of press self-censorship. Second, both of these kinds of damages permit the jury to "punish" unpopular opinions. *Gertz v. Robert Welch, Inc.*, *supra* at 349-50.

The court's first premise in *Gertz*, at page 341, was the same as in *New York Times*—that defamatory statements are not outside the protection of the First Amendment. "The First Amendment requires that we protect some falsehood in order to protect speech that matters." The *Gertz* court's second premise, however, was one not strongly emphasized—namely, the importance of protecting the reputation of the individual. In *New York Times*, this interest was not emphasized because of the plaintiff's status as a public official. Therefore, in *Times* there was not explicit "balancing" of these two interests. *Gertz*, at page 342, however, emphasized that when a private person is subject to defamation, the task is to accommodate and balance "the need for a vigorous and uninhibited press and the legitimate interest in redressing wrongful injury." *Times* and *Curtis*, the court went on to say, did achieve such a proper "accommodation." However, the *Gertz* court stated at page 343, that, for the circumstances in which the *Rosenbloom* rule operated, "the state interest in compensating injury to the reputation of private individuals requires that a different rule should obtain with respect to them."

In explaining its rejection of the rationale of *Rosenbloom*, the court stated what it perceived to be important differences between private persons and persons who are either public figures or public officials: (1) the latter "usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy" (*Gertz v. Robert Welch, Inc., supra* at 344); and, (2) the public officials and public figures have usually voluntarily assumed their prominent position in society and, therefore, "have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them." Thus, the court concluded: "[P]rivate individuals are not only more vulnerable to injury than public officials and public figures; they are also more deserving of recovery." *Gertz v. Robert Welch, Inc., supra* at 345. The court further pointed out the *Rosenbloom*

rule would abridge the legitimate state interest in protecting the private individual "to a degree that we find unacceptable." The court also found the Rosenbloom rule impractical and possibly arbitrary because it required the drawing of a thin line "between the drastic alternatives" of the New York Times privilege and the common-law's strict liability based upon an ad hoc decision by the judge of whether or not the publication addressed an issue of "public or general interest." If the judge found that New York Times applied, this would work an undue hardship on the private plaintiff who would have to meet the "rigorous requirements" of Times; and, if the Times rule didn't apply because the judge deemed there to be no issue of general or public interest, the result would be unfair to the publisher or broadcaster, who would be held liable in damages, including presumed damages, "even if it took every reasonable precaution to ensure the accuracy of its assertions." Gertz v. Robert Welch, Inc., supra at 346.

Justice Blackmun joined four other justices to form the majority in Gertz, even though he concluded: "[T]he step taken in Rosenbloom, extending the New York Times doctrine to an event of public or general interest, was logical and inevitable." Gertz v. Robert Welch, Inc., supra at 353. He had two reasons for his concurrence. First, the court's requirement that actual damages must now be shown in absence of New York Times malice "eliminates significant and powerful motives for self-censorship that otherwise are present in the traditional libel action"; and second, the necessity of having "a clearly defined majority position" in the defamation area was "paramount." Gertz v. Robert Welch, Inc., supra at 354. Accordingly, the court, without itself holding that a standard less than malice was proper, permitted the states to so hold if they wished so to do, or to adhere to the malice standard in Rosenbloom notwithstanding that a private individual was involved.

### STATUS OF PRESS TODAY
The Times rule, even when amplified and extended to the

public person (*Curtis Publishing Co. v. Butts*, 388 U.S. 130, 18 L. Ed. 2d 1094, 87 S. Ct. 1975 (1967)) and public issue (*Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 29 L. Ed. 2d 296, 91 S. Ct. 1811 (1971)), diminished but did not eliminate self-censorship by the press or by the broadcaster. Anderson, *Libel and Press Self-Censorship*, 53 Tex. L. Rev. 422 (1975). What *Gertz* actually does is to increase this risk and expense of litigation concerning publications, oral or written, and to increase the possibility of substantial judgments for damages. Under these circumstances, it would be idle to claim the risk of self-censorship has not been substantially increased by *Gertz*. Insofar, therefore, as the risk of self-censorship has been increased to that extent has the policy of promoting a vigorous and robust discussion of public issues been impaired. The impairment, through threat of libel suits, has long been recognized. *See* W. Swindler, *Problems of Law in Journalism* 99 (1955). *See also* 13 Encyclopedia Brit. 297 (15th ed. 1974); Stevens, *Defamation of Political Figures; Another Look at the Times-Sullivan Rule*, 27 Fed. Com. B.J. 99 (1974). As stated by Stevens at page 102:

> Furthermore, if free expression is restrained by the threat of libel and slander litigation, the restraint largely may be on the mass media. From the media's point of view, the time and expense of court action are worrisome. Carey McWilliams, editor of *The Nation*, observed that even though the restrictions of libel laws have been somewhat "relaxed" because of *Times-Sullivan*, they still cause some publications and broadcasting stations to avoid important topics . . .

### ADVANTAGES OF ROSENBLOOM-MILLER

I turn now to a consideration of the advantages and later the disadvantages of overruling *Miller v. Argus Publishing Co.*, 79 Wn.2d 816, 490 P.2d 101 (1971), and substituting the standard of negligence for the malice standard.

The following six advantages of *Rosenbloom-Miller* may be noticed:

1. The purpose of the *New York Times* rule is better served by *Rosenbloom* ("ventilation of public issues," *Ro-*

*senbloom v. Metromedia, Inc., supra* at 46) than by the negligence standard for the reasons already discussed. *See also* Anderson, *supra* at 422, 446, 451, 453, 459.

2. *Rosenbloom* avoids the uncertainties which the media faces by virtue of *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974). Justice Brennan points out in *Gertz* at pages 368-69:

> On the other hand, the uncertainities which the media face under today's decision are largely avoided by the *Times* standard. I reject the argument that my *Rosenbloom* view improperly commits to judges the task of determining what is and what is not an issue of "general or public interest." I noted in *Rosenbloom* that performance of this task would not always be easy. *Id.*, at 49 n. 17. But surely the courts, the ultimate arbiters of all disputes concerning clashes of constitutional values, would only be performing one of their traditional functions in undertaking this duty. Also, the difficulty of this task has been substantially lessened by that "sizable body of cases, decided both before and after *Rosenbloom*, that have employed the concept of a matter of public concern to reach decisions in . . . cases dealing with an alleged libel of a private individual that employed a public interest standard . . . and . . . cases that applied *Butts* to the alleged libel of a public figure." Comment, The Expanding Constitutional Protection for the News Media from Liability for Defamation: Predictability and the New Synthesis, 70 Mich. L. Rev. 1547, 1560 (1972). The public interest is necessarily broad; any residual self-censorship that may result from the uncertain contours of the "general or public interest" concept should be of far less concern to publishers and broadcasters than that occasioned by state laws imposing liability for negligent falsehood.

(Footnote omitted.) *See also* Anderson, *supra* at 429, 459.

3. The *Rosenbloom* standard fits in best with Washington's fair comment privilege. Washington already precludes recovery by a private person in the case of fair comment upon persons involved in public events, if not malicious. *Cohen v. Cowles Publishing Co.*, 45 Wn.2d 262, 273 P.2d 893 (1954). In that case, the court said at page 264:

Persons who present their work or products to the public for its approval and acceptance, thereby subject it to public criticism, and honest comment upon it is privileged. 3 Restatement of the Law of Torts 287, § 609. Of course, a comment cannot be fair if it is made maliciously, but here the complaint did not allege malice. Neither can a comment be fair if it is based on false statements of fact.

In W. Prosser, *Handbook of the Law of Torts* (4th ed. 1971), the author states at page 822:

The common law privilege of "fair comment" in public discussion was not limited to officers and candidates, but extended to other matters of public concern, such as work to be paid for out of public funds, the admission or disbarment of attorneys, and the management of institutions, such as schools, charities, and churches, in which the public has a legitimate interest. Likewise any private enterprise, to the extent that it begins to affect the general interests of the community, as by the distribution of food, the pollution of the water supply, quack medical services, the promotion of race hatred, the employment of a large number of people, or the operation of a railroad, was held to be a proper subject for such privileged comment.

No reason is apparent why the Constitutional privilege should not be extended to include all such matters of public concern; and in a few jurisdictions the expansion is already under way.

(Footnotes omitted.)

4. Most cases arising under the *Rosenbloom* rule concern organized crime. The importance of permitting a vigorous and aggressive publication of matters concerned with organized crime is apparent. Comment, *The Expanding Constitutional Protection for the News Media from Liability for Defamation: Predictability and the New Synthesis*, 70 Mich. L. Rev. 1547, 1561 n.95 (1972). Moreover, the question may well be asked whether, had there been a negligence standard instead of a malice standard, newspapers would have vigorously pursued the exposure of Watergate.

5. Many states have adopted the *Rosenbloom* standard, before and since *Gertz*, and preserving a uniform rule

would avoid severe conflicts of law problems. Anderson, *supra* at 458-60; Pedrick, *Freedom of the Press and the Law of Libel: A Modern Revised Translation*, 49 Cornell L.Q. 581 (1964); Restatement (Second) Conflict of Laws § 150(1) (1971) (multistate defamation); *Lewis v. Reader's Digest Ass'n*, 162 Mont. 401, 512 P.2d 702 (1973); W. Prosser, *Selected Topics on the Law of Torts* 70, at 89, 123-24 (1954). As stated by Prosser:

> There is, however, the further question of what law is to govern each one of the forty-nine causes of action, or any of the component questions of law which may arise in connection with it; and on this, too, there is no agreement. . . . In connection with interstate publication, it offers peculiar and baffling difficulties. There are at least ten different and inconsistent theories as to the applicable law, which from time to time have been adopted by some court or suggested by learned writers.

(Footnote omitted.) Prosser, *supra* at 89.

> All of it weighs heavily upon the publisher, who finds it difficult to plan, utterly impossible to predict the extent of his liability, and expensive to insure. . . . The result has been, in many cases, an excess of caution and a self-imposed censorship that can operate only as a serious restriction upon the legitimate and desirable freedom of the press.

(Footnotes omitted.) Prosser, *supra* at 123-24.

6. *Rosenbloom* still leaves room for the private defamation suit. Although the *Times* malice test is a difficult test to meet, it has been met before and after *Gertz*, most recently in *Walker v. Colorado Springs Sun, Inc.*, .......... Colo. .........., 538 P.2d 450 (1975). Other cases are cited in Anderson, *Libel and Press Self-Censorship*, 53 Tex. L. Rev. 422, at 430, 435-38 (1975); H. Nelson & D. Teeter, *Law of Mass Communications* 123-25, 127 (2d ed. 1973); Stevens, *Defamation of Political Figures; Another Look at the Times-Sullivan Rule*, 27 Fed. Com. B.J. 99, 103 (1974).

PROBLEMS WITH GERTZ AND THE MAJORITY OPINION

Much of the majority opinion adopts as acceptable the rationale of the majority opinion in *Gertz*; but, in *Gertz*

this rationale is used for the purpose of explaining why the states should have the right to determine for themselves whether to retain the malice standard in *Rosenbloom* or to adopt a standard such as negligence. It is still necessary to determine whether the suggested rationale of the majority opinion in *Gertz*, used there for another purpose, should be used in determining whether to actually adopt the nonmandated negligence standard. The majority opinion in the instant case, in adopting arguments discussed in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974), provides no defense or provides an inadequate defense to the weaknesses in those arguments as pointed out by Justice Brennan. The following weaknesses should be noted.

1. Distinguishing public persons because they assume the risk of defamation bears little relationship to the values the First Amendment protects.

Further reflection over the years since *New York Times* was decided persuades us that the view of the "public official" or "public figure" as assuming the risk of defamation by voluntarily thrusting himself into the public eye bears little relationship either to the values protected by the First Amendment or to the nature of our society. We have recognized that "[e]xposure of the self to others in varying degrees is a concomitant of life in a civilized community." *Time, Inc.* v. *Hill*, [385 U.S. 374, 388, 17 L. Ed. 2d 456, 87 S. Ct. 534 (1967)]. Voluntarily or not, we are all "public" men to some degree. Conversely, some aspects of the lives of even the most public men fall outside the area of matters of public or general concern. See n. 12, *supra*; *Griswold* v. *Connecticut*, 381 U. S. 479 (1965). Thus, the idea that certain "public" figures have voluntarily exposed their entire lives to public inspection, while private individuals have kept theirs carefully shrouded from public view is, at best, a legal fiction. In any event, such a distinction could easily produce the paradoxical result of dampening discussion of issues of public or general concern because they happen to involve private citizens while extending constitutional encouragement to discussion of aspects of the lives of "public figures" that are not in the area of public or general concern.

(Footnote omitted.) *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 47-48, 29 L. Ed. 2d 296, 91 S. Ct. 1811 (1971). *See also Rosenbloom v. Metromedia, Inc., supra* at 41-43, 46-47; Anderson, *supra* at 480.

2. Public figures can reply rarely and ineffectively.

While the argument that public figures need less protection because they can command media attention to counter criticism may be true for some very prominent people, even then it is the rare case where the denial overtakes the original charge. Denials, retractions, and corrections are not "hot" news, and rarely receive the prominence of the original story. When the public official or public figure is a minor functionary, or has left the position that put him in the public eye, see *Rosenblatt v. Baer* [383 U.S. 75, 15 L. Ed. 2d 597, 86 S. Ct. 669 (1966)], the argument loses all of its force. In the vast majority of libels involving public officials or public figures, the ability to respond through the media will depend on the same complex factor on which the ability of a private individual depends: the unpredictable event of the media's continuing interest in the story. Thus the unproved, and highly improbable, generalization that an as yet undefined class of "public figures" involved in matters of public concern will be better able to respond through the media than private individuals also involved in such matters seems too insubstantial a reed on which to rest a constitutional distinction. Furthermore, in First Amendment terms, the cure seems far worse than the disease. If the States fear that private citizens will not be able to respond adequately to publicity involving them, the solution lies in the direction of ensuring their ability to respond, rather than in stifling public discussion of matters of public concern.

(Footnote omitted.) *Rosenbloom v. Metromedia, Inc., supra* at 46-47.

3. Presence of the private individual in an event of public interest doesn't make the event less significant.

If a matter is a subject of public or general interest, it cannot suddenly become less so merely because a private individual is involved, or because in some sense the individual did not "voluntarily" choose to become involved. The public's primary interest is in the event; the

public focus is on the conduct of the participant and the content, effect, and significance of the conduct, not the participant's prior anonymity or notoriety.

*Rosenbloom v. Metromedia, Inc., supra* at 43. The court used the facts in *Rosenbloom* as an example:

> The community has a vital interest in the proper enforcement of its criminal laws, particularly in an area such as obscenity where a number of highly important values are potentially in conflict: the public has an interest both in seeing that the criminal law is adequately enforced and in assuring that the law is not used unconstitutionally to suppress free expression.

*Rosenbloom v. Metromedia, Inc., supra* at 43. This is the only way to protect "the commitment to robust debate on public issues, which is embodied in the First Amendment . . ." *Rosenbloom v. Metromedia, Inc., supra* at 43-44.

4. In terms of public interest in all appropriate information, a public-private persons distinction is artificial.

> [D]ecisions [after *Times*] have disclosed the artificiality, in terms of the public's interest, of a simple distinction between "public" and "private" individuals or institutions:
>
> > "Increasingly in this country, the distinctions between governmental and private sectors are blurred. . . . In many situations, policy determinations which traditionally were channeled through formal political institutions are now originated and implemented through a complex array of boards, committees, commissions, corporations, and associations, some only loosely connected with the Government. This blending of positions and power has also occurred in the case of individuals so that many who do not hold public office at the moment are nevertheless intimately involved in the resolution of important public questions . . . .
> >
> > ". . . Our citizenry has a legitimate and substantial interest in the conduct of such persons, and freedom of the press to engage in uninhibited debate about their involvement in public issues and events is as crucial as it is in the case of 'public officials.' " *Curtis Publishing Co. v. Butts,* 388 U. S. 130, 163-164 (1967) (Warren, C. J., concurring in result).

*Rosenbloom v. Metromedia, Inc., supra* at 41-42. *See also* Anderson, *supra* at 480.

5. The difficulties faced by the adoption of the negligence standard are many. It will take a generation of litigation to qualify and explain what the negligence standard means.

a. Uncertainties of the negligence standard.

> The reasonable-care standard is "elusive," *Time, Inc. v. Hill, supra,* [385 U.S. 374, 17 L. Ed. 2d 456, 87 S. Ct. 534 (1967)] at 389; it saddles the press with "the intolerable burden of guessing how a jury might assess the reasonableness of steps taken by it to verify the accuracy of every reference to a name, picture or portrait." *Ibid.* Under a reasonable-care regime, publishers and broadcasters will have to make pre-publication judgments about juror assessment of such diverse considerations as the size, operating procedures, and financial condition of the newsgathering system, as well as the relative costs and benefits of instituting less frequent and more costly reporting at a higher level of accuracy.

*Gertz v. Robert Welch, Inc., supra* at 366 (Brennan, J., dissenting). *See also* Anderson, *Libel and Press Self-Censorship*, 53 Tex. L. Rev. 422, at 425, 440, 454-56, 465-67, 480 (1975); Restatement (Second) of Torts § 580B, comments *f* & *g* at 31-33 (Tent. Draft No. 21, 1975).

b. States adopting the negligence standard won't be able to rely solely upon the existing negligence law developed in physical torts. Anderson, *supra* at 460-62; Kalven, *The Reasonable Man and the First Amendment: Hill, Butts, and Walker*, 1967 Sup. Ct. Rev. 267. As Kalven states it at page 303:

> My appetite for generalization is not up to an effort to unify tort theory and speech theory. The two traditions are too different. My preference, in this novel context at least, is to accord to speech and press "a preferred position" among useful activities or services. In a profound sense the commitment to free speech is quixotic and gallant; it is not a matter for prudence. Mr. Justice Brennan captured the flavor exactly in *New York Times* when he mentioned "the principle that debate on public issues should be uninhibited, robust, and wide-open." I suspect that, properly viewed, there is in the world of the First

Amendment no place for "the reasonable prudent man." (Footnote omitted.)

c. The negligence standard could be unduly harsh on the media. Frakt, *The Evolving Law of Defamation: New York Times Co. v. Sullivan to Gertz v. Robert Welch, Inc., and Beyond*, 6 Rutgers-Camden L.J. 471, at 495 (1975). Uncertainty of the jury verdict in a controversial case is very great. It will lead to punishment by the jury for unpopular expression.

> And, most hazardous, the flexibility which inheres in the reasonable-care standard will create the danger that a jury will convert it into "an instrument for the suppression of those 'vehement, caustic, and sometimes unpleasantly sharp attacks,' . . . which must be protected if the guarantees of the First and Fourteenth Amendments are to prevail." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 277 (1971).
>
> The Court does not discount altogether the danger that jurors will punish for the expression of unpopular opinions. This probability accounts for the Court's limitation that "the States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth." *Ante*, at 349. But plainly a jury's latitude to impose liability for want of due care poses a far greater threat of suppressing unpopular views than does a possible recovery of presumed or punitive damages. Moreover, the Court's broad-ranging examples of "actual injury," including impairment of reputation and standing in the community, as well as personal humiliation, and mental anguish and suffering, inevitably allow a jury bent on punishing expression of unpopular views a formidable weapon for doing so.

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 367, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974) (Brennan, J., dissenting). *See also Gertz* at page 356 (Douglas, J., dissenting); 41 Brooklyn L. Rev. 389, 404 (1974).

d. Undesirable burden of proof in negligence standard. The burden of proof is preponderance of evidence in negligence cases. This increases the possibility of erroneous ver-

dicts and therefore increases the likelihood of self-censorship.

> In the normal civil suit where this standard is employed, "we view it as no more serious in general for there to be an erroneous verdict in the defendant's favor than for there to be an erroneous verdict in the plaintiff's favor." *In re Winship*, 397 U. S. 358, 371 (1970) (HARLAN, J., concurring). In libel cases, however, we view an erroneous verdict for the plaintiff as most serious. Not only does it mulct the defendant for an innocent misstatement —the three-quarter-million-dollar jury verdict in this case could rest on such an error—but the possibility of such error, even beyond the vagueness of the negligence standard itself, would create a strong impetus toward self-censorship, which the First Amendment cannot tolerate. These dangers for freedom of speech and press led us to reject the reasonable-man standard of liability as "simply inconsistent" with our national commitment under the First Amendment when sought to be applied to the conduct of a political campaign. *Monitor Patriot Co. v. Roy*, 401 U. S. 265, 276 (1971). The same considerations lead us to reject that standard here.

*Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 50-51, 29 L. Ed. 2d 296, 91 S. Ct. 1811 (1971). *See also* Anderson, *supra* at 467-68; Restatement (Second) of Torts, § 580B, comment *i* at 33-34 (Tent. Draft No. 21, 1975).

e. Negligence standard will lead to self-censorship of media, because negligence standard is close to requiring guarantee of truth.

> [A]s the Court agrees, some abuse of First Amendment freedoms is tolerated only to insure that would-be commentators on events of public or general interest are not "deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so." *New York Times Co. v. Sullivan*, 376 U. S., at 279. The Court's holding . . . simply [denies] free expression its needed "breathing space." Today's decision will exacerbate the rule of self-censorship of legitimate utterance as publishers "steer far wider of the unlawful zone," *Speiser* v. *Randall*, 357 U. S. 513, 526 (1958).

*Gertz v. Robert Welch, Inc., supra* at 365 (Brennan, J., dissenting). *See also* Anderson, *supra* at 428-30; Kalven, *supra* at 304-05.

f. The negligence standard inhibits summary judgment, thereby increasing the likelihood of self-censorship. Anderson, *supra* at 456-58, 469. Anderson states the matter at page 457:

> Some courts will deny summary judgment on the ground that a negligence standard requires the kind of factual determination that has always been regarded as peculiarly within the competence of juries. But uncertainty concerning the definition of negligence represents the most important obstacle to summary procedure under *Gertz.* Whether it will be defined with the particularity that characterizes recklessness under *Times* remains to be seen, but unless the courts describe the negligence standard with some precision, the purposes of the *Gertz* privilege will be defeated just as surely as those of the *Times* privilege would have been if the Court had left the determination of reckless disregard to the unquestioned judgment of juries.

(Footnote omitted.)

g. Appellate review of determination of negligence cannot be avoided.

> The real thrust of Brothers HARLAN's and MARSHALL's position, however, is their assertion that their proposal will not "constitutionalize" the factfinding process. But this clearly is not the way their test would work in practice. Their approach means only that factfinding will shift from an inquiry into whether the defamatory statements were knowingly or recklessly uttered to the inquiry whether they were negligently uttered, and if so, to an inquiry whether plaintiff suffered "actual" damages. This latter inquiry will involve judges even more deeply in factfinding.

*Rosenbloom v. Metromedia, Inc., supra* at 53.

> The determination of whether a defendant was negligent involves the application of the standard (what a reasonable person would do) to the facts which are found to exist in the particular case. This question is frequently called a fact issue and it is normally submitted to the

> jury. But the rule that liability cannot be imposed for a defamatory publication unless the defendant was negligent or more seriously at fault is a rule imposed by the Constitution. The application of the standard, therefore, necessarily involves a constitutional right, as in the case of the determination of whether the defendant acted in reckless disregard of the truth or falsity of a communication in a defamation action by a public official or public figure . . . As in that case, the determination is subject to possible constitutional review all the way through the appellate process.

Restatement (Second) of Torts § 580B, comment *j* at 34 (Tent. Draft No. 21, 1975). *See also* Anderson, *supra* at 467-68.

6. There are great difficulties created by the new rule as to damages. The *Gertz* rule adopted in the majority opinion still requires a determination of whether the plaintiff is a public figure or a private individual. If one is a public figure or a public official, he will be entitled to all the common-law presumptions the state allows. These presumptions include the presumption of damage. On the other hand, if he is a private person, he is only entitled to recover his actual damages. *See* Comment, *Gertz v. Robert Welch, Inc.: Constitutional Privilege and the Defamed Private Individual*, 8 John Marshall J. Prac. & Proc. 531, at 544-45 (1975). There will thus be much litigation over the question of whether the plaintiff is a public figure or a private person in order to determine what measure of damages applies.

Actual damages may still lead to large judgments because, according to *Gertz*, pecuniary loss recoverable includes losses sustained by "impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." *Gertz v. Robert Welch, Inc.*, *supra* at 350. *See* Anderson, *Libel and Press Self-Censorship*, 53 Tex. L. Rev. 422, at 472-73 (1975); 41 Brooklyn L. Rev. 389, 401 (1974).

An actual damages limit still serves to submit the media to expensive litigation and therefore impairs the First

Amendment protection permitting the robust discussion of public issues.

> It is not simply the possibility of a judgment for damages that results in self-censorship. The very possibility of having to engage in litigation, an expensive and protracted process, is threat enough to cause discussion and debate to "steer far wider of the unlawful zone" thereby keeping protected discussion from public cognizance. *Speiser* v. *Randall*, 357 U. S., at 526. Cf. *Blonder-Tongue Laboratories, Inc.* v. *University of Illinois Foundation*, 402 U. S. 313, 334-339 (1971). Too, a small newspaper suffers equally from a substantial damage award, whether the label of the award be "actual" or "punitive."

*Rosenbloom v. Metromedia, Inc., supra* at 52-53. *See also* Anderson, *supra* at 424-25.

### THE MAJORITY OPINION

It follows from what has been said that I must disagree with the majority's position. The following points of disagreement are illustrative.

1. The majority opinion states that the basic policy underlying the *Times* rule is the need to have an uninhibited "marketplace of ideas" which is achieved by giving a "near absolute constitutional protection" to the media.

The majority overstates the policy, and even then does little to implement the policy as stated in *Times* and its progeny.

2. The majority argues the policy embraced by the First Amendment cannot be unlimited, because the intentional lie and the careless error do not contribute to this debate on public issues.

However, the *Times* standard does not protect the intentional lie; the *Times* standard recognizes that unintentional error must be protected to avoid self-censorship on a wide scale.

3. The majority states that in protecting against the intentional lie and careless error, malice has traditionally not been a necessary element.

This argument fails to give proper effect to the place of actual malice in defeating a conditional privilege, including

particularly the fair comment privilege which embraces all defamation pertaining to issues of public interest. In such cases, the plaintiff, by proving actual malice, may recover. 1 F. Harper & F. James, *The Law of Torts* § 5.27, at 451 (1956).

4. The majority then argues that consistent with the state's policy that a citizen should have redress in the courts for defamatory statements, it would be more fair and equitable to permit a recovery by the citizen regardless of the First Amendment requirements.

This is a policy judgment subjective in nature unsupported by empirical evidence and ignoring the advantages of the *Rosenbloom-Miller* rule above discussed.

5. The majority then argues that the rule of liability should be different when a private person is defamed. The rationale used is that a public officer or public figure has a better opportunity to reply, and that the public official's and public figure's interest in having their reputations protected is outweighed by the need of the public to be informed as to anything bearing on their fitness to hold office or influence over public events.

These a priori subjective judgments are not supported by any empirical evidence that public figures or public officials have the access to the media claimed. The media still must determine whether it will give the access which it is not required by law to give, and that determination will not necessarily be made on the basis that the persons involved are either public officials or public figures.

6. The majority then argues the public official or public figure has voluntarily entered the limelight and should be limited by the malice standard. The private person, on the other hand it is claimed, has not voluntarily entered the limelight and has not invited possible defamation.

The majority fails to note that the interest to be protected is the valid public interest, not the person; that even under the common law, persons were not protected if either absolute or conditional privilege or the defense of fair comment could be invoked.

7. The majority then argues that the negligence standard will not create self-censorship to an undue degree.

This conclusion is unsupported by any empirical evidence and is merely a subjective expectation. The argument in support of the subjective judgment is, according to the majority opinion, that greater caution is justified if the subject is a private person, because the social value in protecting his reputation outweighs the social value in publishing a defamatory falsehood about him. However, the social value of permitting nonmalicious falsehoods about private individuals must be viewed in a much broader manner. If primary allegiance is given to the public interest in a robust, public discussion, then to adopt the rule proposed by the majority, which would impair the likelihood of a robust public discussion, is to do violence to the reach of the First Amendment accepted in *Times* and *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 18 L. Ed. 2d 1094, 87 S. Ct. 1975 (1967). Both *Times* and *Butts* have been followed in Washington. *Grayson v. Curtis Publishing Co.*, 72 Wn.2d 999, 436 P.2d 756 (1967).

8. The majority then argues that the rule does not require the media to guarantee accuracy and that the standard is far from strict liability.

The majority, however, does not examine the questions of whether (1) the threats and burdens on the press and broadcaster from litigation, or (2) the uncertainties or lack of limits on negligence, or (3) a standard coming close to requiring a guaranteed accuracy—all forcing self-censorship—are arguments that militate against the validity of the majority's argument as advanced.

9. The majority argues that the malice rule is a near absolute immunity for the media.

It is of course nothing of the kind. *See Walker v. Colorado Springs Sun, Inc.*, ............ Colo. ............, 538 P.2d 450 (1975); H. Nelson & D. Teeter, *Law of Mass Communications* 124-25, 127 (1973); Stevens, *Defamation of Political Figures; Another Look at the Times-Sullivan Rule*, 27 Fed. Com. B.J. 99, 103 (1974).

10. The majority finally argues that the biggest threat to the media is removed through the abolition of presumed damages.

That this is not correct is evident from the kind of damages that *Gertz* still permits to be recovered; namely, damages in addition to actual pecuniary loss, including "impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 350, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974).

### CONCLUSION

The majority opinion in *Gertz* would not have been possible without Justice Blackmun's concurrence. He conceded that *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 29 L. Ed. 2d 296, 91 S. Ct. 1811 (1971), was more logical and preferable, but apparently preferred the certainty of a wrong rule to the uncertainty of a rule, the correctness of which was disputed. Actually, therefore, the *Gertz* opinion represents the convictions of only four justices. Moreover, if a standard less than malice, in the case of a private individual involved in an event of public or general interest, was so persuasive and convincing, it would have been more logical for the *Gertz* majority to adopt such a standard which would have made the standard uniform throughout the country.

In addition, the *Rosenbloom* rule should be adopted not only because it is the more logical and preferable rule, but to avoid as much as possible problems created by standards of liability which would vary from state to state. Already there are at least 20 jurisdictions, including Washington, that have adopted the malice standard in matters of public or general concern, before and since *Gertz. See* cases cited in *Gertz v. Robert Welch, Inc., supra* at 377-80, n.10 (White, J., dissenting). *See also Walker v. Colorado Springs Sun, Inc.,* ............ Colo. ............, 538 P.2d 450 (1975); *AAFCO Heating & Air Conditioning Co. v. Northwest Publications, Inc.,* ............ Ind. App. ............, 321 N.E.2d 580 (1974); *Commercial Programming, Unlimited v. Columbia Broad-*

*casting Sys., Inc.,* 81 Misc. 2d 678, 367 N.Y.S.2d 986 (Sup. Ct. 1975). It would be desirable that this court not be the source of undesirable diversity.

Basically, the majority opinion has rejected the theory of the First Amendment as explained in *Times* and its progeny. The majority has done this notwithstanding it is still the law of the land that the First Amendment protections enjoy a primary and preferential position in the hierarchy of values protected by the Bill of Rights. *Miller v. Argus Publishing Co.,* 79 Wn.2d 816, 490 P.2d 101 (1971), recognized the primacy of the public interest in the First Amendment when it concluded to follow *Rosenbloom.*

Considering the difficulties inherent in the negligence standard coupled with a change in the measure of damages, and a resulting far more complicated law of defamation created by the majority opinion, it is difficult in the absence of empirical evidence to accept the majority position that the new standard is better than the old.

I would adhere to *Miller v. Argus Publishing Co., supra,* and affirm the judgment below.

Utter, J., concurs with Horowitz, J.